657 So.2d 808 (1995)
Charles M. DAY, Jr. and Elizabeth Ann Day
v.
Doyle A. MORRISON, M.D.
No. 91-CA-00978-SCT.
Supreme Court of Mississippi.
June 15, 1995.
*809 William L. Waller, Jr., Waller & Waller, Jackson, Cotton Ruthven, University, for appellant.
Chris J. Walker, Al Nuzzo, Markow Walker Reeves & Anderson, Jackson, for appellee.
EN BANC.

ON PETITION FOR REHEARING
McRAE, Justice, for the Court:
The original opinions are being withdrawn and these opinions are substituted therefor.
Charles M. Day, Jr., and his wife, Elizabeth Ann Day, appeal the decision of the Circuit Court of the First Judicial District of Hinds County, finding that Dr. Doyle A. Morrison exercised minimal surgical competence in performing the surgical insertion of a penile prosthesis to correct a sexual dysfunction. Finding that the jury was improperly instructed, we reverse and remand to the lower court for a new trial.
The Days appealed to this Court citing the following assignments of error:
I. JURY INSTRUCTIONS D-11 AND D-18 ARE NOT THE LAW IN MISSISSIPPI, SPECIFICALLY THE PHRASES "A COMPETENT PHYSICIAN IS NOT LIABLE PER SE FOR A MERE ERROR OF JUDGMENT" IN D-11, AND "LIABILITY MAY NEVER BE IMPOSED UPON A PHYSICIAN FOR THE MERE EXERCISE OF A BONA FIDE MEDICAL JUDGMENT" AS STATED IN D-18.
II. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
III. THE COURT SHOULD HAVE ALLOWED EACH JUROR TO HAVE A COPY OF EXHIBIT 1 TO FOLLOW TESTIMONY OF WITNESSES DURING THE TRIAL.
We address only the issue of whether jury instructions D-11 and D-18 were properly granted by the court. We find all other issues to be without merit.

FACTS
Charles M. Day, Jr. and his wife, Elizabeth Ann Day, filed a Complaint in the Circuit Court of the First Judicial District of Hinds County, Mississippi on March 22, 1989 against Dr. Doyle A. Morrison for damages arising from complications of a penile implant surgery performed November 24, 1986.
At the time of trial, the Days had been married for thirty-four years. Day had been married for eight years previously, and through both marriages he fathered four children. Day has a history of health related problems. At age thirteen, Day had the mumps which caused his left testicle to atrophy. In 1972, he had a hernia operation which caused his right testicle to atrophy. In 1986, Day fell off a roof, breaking his left leg in three places above the knee, fracturing his right leg below the knee, and breaking his left arm. Prior to this accident, he fell out of a tree, breaking his right leg below the knee, his back, and his right arm. While Day testified that none of the falls contributed to any of his problems, he testified that he had "pins and things" in the broken areas, a plate in his knee, a pin in his hip, and three lobes in his back "clamped together."
In 1972, Day was treated by a Dr. Weiner for sexually related complications of hernia surgery, primarily impotence. Dr. Weiner gave Day testosterone by injection and oral medication. Day testified that he was able to perform sexually for several years after using the medication. He stated financial and family problems in 1978 caused impotency, but the problem cleared and he was able to function normally. However, he continued to see Dr. Weiner until 1984 with his medication adjusted.
Day first visited Dr. Morrison on April 16, 1986 because of a curvature of his penis which complicated sexual relations. After several office visits with Day, Morrison met with Day and his wife on October 31, 1986 to discuss methods to treat impotence, including the availability of penile prostheses. Morrison discussed the possibility of having to revise the inflatable prostheses. Morrison testified that he did not guarantee success. *810 The surgery was performed on November 24, 1986 to insert an inflatable penile prosthesis.[1] After surgery, Day visited Morrison to resolve any problems that may have occurred after surgery. Day complained about the pain he experienced.
Day testified that Morrison was not able to inflate the prosthesis during the office visits and he alleged that the prostheses were "crossed over".[2] (See Diagram).

From December 3, 1986 until December 26, 1986, the notes illustrate Morrison's belief that the prosthesis was in place, but neither Morrison nor Day were able to inflate the device because it caused pain. On December 26, 1986, Morrison wrote that "again the prosthesis is inflated and deflated without difficulty. I cannot feel the device completely in the left corpora, but it feels as though to me that it is in place. His erection is satisfactory to me, and he does have some mild curvature to the left, but it should certainly enable him to have intercourse."
On January 9, 1987, the office notes state "everything seems to be going well except that the left corpora cavernosa feels devoid of the penile prosthesis." At this point, Morrison ordered x-rays to determine whether the prosthesis "had fallen back." On January 12, 1987, Morrison wrote that "there is a deviation of the left cylinder medially ... it does not appear that the left cylinder is in the correct corporal body, but I am not 100 percent sure." Morrison referred Day to Dr. Richard Pearson for a second evaluation.
Dr. Pearson saw Day on February 4, 1987. Upon examining the prosthesis, Pearson could not tell whether the cylinders were crossed over, although his notes indicated that he believed "that the tips of the cylinders were more to the right side than the left side." Pearson told Day that another surgery was necessary to reposition the cylinders, but the situation was not an emergency. Pearson stated that Morrison followed "the procedure exactly the way it should have been done", and that he "did not find anything in the record that was inconsistent with good medical care." Pearson believed that the crossover occurred after surgery because *811 of "some weakness in the portion of the penis that separates the two halves of the penis."
Day's brother, who was also a doctor, recommended Day visit Dr. Larry Weems in March, 1987. Weems performed surgery May 12-13, 1987, six and one-half months after Morrison's operation, to take out and reinsert the prosthesis that Morrison had put in place earlier. By July 1987, after the operation, the right cylinder would not inflate, and Day lost desire for intercourse because of pain. Dr. Weems then referred Day to Dr. William Furlow. Furlow saw Day in September, 1988.
Testifying for Day, Furlow stated that a cylinder crossover cannot occur "without a defect in the cylinders." A defect was defined as a hole that is made "in the course of dilating the cylinders, the cavernous bodies and passing the dilator through the septum to the other side, or using the insertion tool and passing the insertion tool through the septum to the other side." Furlow testified that a doctor "should be able to identify cylinder crossover intra-operatively. You have to be able to do that to prevent this complication."
Furlow examined Day to determine the possibility of correcting the problems Weems encountered. Furlow testified that the right cylinder would not inflate. He performed a third surgery to correct the crossover problem. Because there was great risk of infection, Furlow performed an operation to divert Day's urination down under the scrotum until the urethra wall could heal. However, Day developed a "full-blown infection" and the device had to be removed. Thus, this lawsuit.

DISCUSSION OF LAW
The Days opposed two jury instructions, D-11 and D-18, which stated:
D-11
The Court instructs the jury that when a physician undertakes to treat a patient, he takes on an obligation enforceable at law to use minimally sound medical judgment and render minimally competent care in the course of services he provides. A physician does not, however, guarantee recovery or favorable results. Therefore, a competent physician is not liable per se for a mere error of judgment or the occurrence of an undesirable results, if Dr. Morrison [sic] treatment is accordance [sic] to minimum [sic] standards of a urologist [sic]. In other words, you are instructed that the fact that Mr. Day could not obtain an erection and have sexual relations with Mrs. Day following his penile implant surgery does not raise any presumption whatsoever that Dr. Morrison was guilty of medical negligence. (emphasis added)
D-18
The Court instructs the jury that medicine is not an exact science and liability may never be imposed upon a physician for the mere exercise of a bona fide medical judgment which turns out, with the benefit of hindsight, to have been mistaken and to the contrary to what a qualified medical expert witness in the exercise of his good medical judgment would have done; a physician does not guarantee recovery and a competent physician is not liable per se for a mere error of judgment or the occurrence of an undesirable result. You are further instructed that no physician is either a guarantor nor does he insure the success of any medical care or treatment rendered to a patient. Instead, a physician has a duty to exercise such reasonable, diligent, skillful, competent and prudent care as is practiced by minimally competent physicians in the same specialty or general field of practice. Thus, even if you should find from a preponderance of the evidence that the Defendant, Dr. Morrison, was somehow mistaken in his treatment of Mr. Day or that the penile implant surgery may have been performed contrary to what Dr. Furlow would have done, you must return a verdict in favor of Dr. Morrison unless you are convinced from a preponderance of the credible evidence that in caring for and treating Mr. Day, Dr. Morrison failed to exercise that degree of reasonable diligence, skill, competence and prudence which is practiced by a minimally competent urologist under same or similar circumstances. (emphasis added)
*812 Instructions D-11 and D-18 in fact preclude the plaintiff from ever recovering because these two instructions, when read together, tell the jury that even though a doctor may be negligent, that he may not have treated a patient according to the minimally accepted standards, or that he was mistaken, then this is acceptable, and the jury is to find for the Defendant doctor.[3] The so-called "bona fide" or "good faith" judgment instruction has been soundly criticized by a number of our sister states. The "mere error of judgment" language in an instruction has been highly criticized and has been found in recent case law to permit too much. Riggins v. Mauriello, 603 A.2d 827, 831 (Del.Supr. 1992) (finding plain error in the giving of such an instruction). "Under this standard, a jury could too readily conclude, incorrectly, that a physician is not liable for malpractice even if he or she is negligent in administering the treatment selected." Id. Delaware has joined numerous other courts in holding that mere error of judgment language is confusing for the jury. Riggins, 603 A.2d at 830 (citing Kobos v. Everts, 768 P.2d 534 (Wyo.Supr. 1989); Leazer v. Kiefer, 120 Idaho 902, 821 P.2d 957 (1991); Logan v. Greenwich Hosp. Ass'n., 191 Conn. 282, 465 A.2d 294 (1983); Magbuhat v. Kovarik, 382 N.W.2d 43 (S.D.Supr. 1986); Ouellette v. Subak, 391 N.W.2d 810 (Minn.Supr. 1986); Rogers v. Meridian Park Hosp., 307 Or. 612, 772 P.2d 929 (1989); Schwab v. Tolley, 345 So.2d 747 (Fla. 1977); Shamburger v. Behrens, 380 N.W.2d 659 (S.D.Supr. 1986); Sleavin v. Greenwich Gynecology and Obstetrics, 6 Conn. App. 340, 505 A.2d 436 (1986); Somer v. Johnson, 704 F.2d 1473 (11th Cir.1983); Wall v. Stout, 310 N.C. 184, 311 S.E.2d 571 (1984); and Watson v. McNamara, 229 Neb. 1, 424 N.W.2d 611 (1988).
Our sister state of Alabama has analyzed the problem and reviewed the approaches taken in other jurisdictions. Shumaker v. Johnson, 571 So.2d 991 (Ala. 1990). That court reasoned as follows:
The trial court gave the following jury charge:
There is no requirement under our law that the physician be infallible in his diagnosis or treatment of his patient. And where the proper course of treatment in a particular situation is subject to reasonable doubt, a physician is not liable for an honest mistake or an honest error or judgment, so long as he meets the required standard of care.
Shumaker contends that this jury charge should not be allowed in medical malpractice cases because it tends to confuse the jury. She contends that the charge implies that the doctor must "in bad faith" commit an error or omission that causes the plaintiff injury. Additionally, she contends that the charge denies plaintiffs in medical malpractice cases equal protection of the law because only doctors, among professionals, are entitled to the "good faith error" charge.
* * * * * *
Initially, we note that the legislature has codified the standard of care to be exercised by physicians in this state. Code 1975, § 6-5-484, provides as follows:
(a) In performing professional services for a patient, a physician's, surgeon's, or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case. In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill and diligence used by hospitals generally in the community ...
* * * * * *
This statutory standard is clear and unambiguous. There is no mention of the physician's "good faith" in the performance of his professional duties. The Code section clearly states an objective standard for the performance of professional duties by physicians. Cf. Somer v. Johnson, 704 *813 F.2d 1473 (11th Cir.1983) (holding that "honest error" jury charge does not correctly state the standard of care required of physicians by Fla. Stat. Ann. § 768.40 et seq.).
* * * * * *
[W]e note that a growing number of jurisdictions have abandoned the "good faith" rule in recent years. See, e.g., Rogers v. Meridian Park Hospital, 307 Or. 612, 772 P.2d 929 (1989) (disapproved where differing treatment choices are possible); Kobos v. Everts, 768 P.2d 534 (Wyo. 1989) ("honest error" language in jury charge does not address legal standard of care but merely speaks to a moral duty); Ouellette v. Subak, 391 N.W.2d 810 (Minn. 1986) (Upon reflection we now conclude the time has come to hold that in professional malpractice cases the mostly subjective "honest error in judgment" language is inappropriate in defining the scope of the professional's duty); Magbuhat v. Kovarik, 382 N.W.2d 43 (S.D. 1986) (standard of care for doctors is the same as that for other professionals, and good faith or bad faith in deviation from the standard is irrelevant); Watson v. Hockett, 107 Wash.2d 158, 727 P.2d 669 (1986) (use of cord "honest" imparts argumentative aspect to jury charges on standard of care); Wall v. Stout, 310 N.C. 184, 311 S.E.2d 571 (1984) (holding that "honest error" charge is potentially confusing when made part of jury charge on standard of care); Teh Len Chu v. Fairfax Emergency Medical Associates, 223 Va. 383, 290 S.E.2d 820 (1982) (terms such as "bona fide error" or "honest mistake" have no place in instructions dealing with negligence in medical malpractice actions); Veliz v. American Hosp., Inc., 414 So.2d 226 (Fla. Dist. Ct. App.), rev. denied, 424 So.2d 760 (Fla. 1982) (holding that an honest error charge in nurse's negligence case is potentially confusing to jury).
It has been noted:
In Logan v. Greenwich Hospital Ass'n., 191 Conn. 282, 465 A.2d 294 (1983), the court stated:
"[T]o use such a phrase [that a doctor would not be liable for a "bona fide error in judgment"] in a charge upon negligence serves only to confuse the jury by implying that only an error in judgment made in bad faith can be actionable. The central issue in the ordinary negligence case is whether the defendant has deviated from the required standard of reasonable care, not his mental state at the time of the conduct which constitutes the deviation." 191 Conn. at 299, 465 A.2d at 303.
In the case of Teh Len Chu v. Fairfax Emergency Medical Associates, 223 Va. 383, 290 S.E.2d 820 (1982), the court stated:
"`[W]e believe that terms such as "honest mistake" and "bona fide error" have no place in jury instructions dealing with negligence in medical malpractice cases. The terms not only defy rational definition but also tend to muddle the jury's understanding of the burden imposed upon a plaintiff in a malpractice action. If use of the terms were permitted, it would be appropriate to ask: Must a plaintiff prove a "dishonest mistake" or a "bad faith error" in order to recover? The obvious negative answer reveals the vice in the use of the terms.'"
Sasser v. Connery, 565 So.2d 50 (Ala. 1990) (Hornsby, C.J., concurring specially).
571 So.2d at 993-994.
The instructions in the instant case are even less exacting than those found wanting in the cases cited by the Alabama court. See, e.g. Thomas v. Wilfac, Inc., 65 Wash. App. 255, 828 P.2d 597, 602 (1992) (approving an instruction that a "physician is not liable for an error of judgment if, in arriving at that judgment, the physician exercised reasonable care and skill within the standard of care ...").
The history behind the "mere error of judgment" language first crept into our case-law in Hall v. Hilbun, 466 So.2d 856 (Miss. 1985). In Hall, without citing any authority, this Court proclaimed in dicta that "a competent physician is not liable per se for a mere error of judgment, mistaken diagnosis or the occurrence of an undesirable result." Hall, 466 So.2d at 866. Hall concerned the question of whether the plaintiff's out-of-state experts should be allowed to testify under *814 our then-existing locality rule which was incorporated in our standard of care and since abolished. Id. The "mere error of judgment" language then found its way in Clayton v. Thompson, 475 So.2d 439 (Miss. 1985). Clayton did not acknowledge that Hall's comments were dicta and instead, recited the phrase as law. The gist of Clayton was a "loss of chance" of recovery instruction and, the familiar appeal against the qualification of the patient's doctor witness as an expert.
Most recently, this Court employed the "mere error of judgment" language in Harris v. Shields, 568 So.2d 269 (Miss. 1990). Harris used the phrase in the context of dental malpractice. Harris, 568 So.2d at 272-73 (citing to Hudson v. Taleff, 546 So.2d 359, 364 (Miss. 1989). Hudson, Harris supposed authority, nowhere uses the "mere error of judgment" language. What Hudson did hold was:
Our law has never held a physician or surgeon liable for every untoward result which may occur in medical malpractice. A physician is not an insurer of the success of his care and treatment. Walker By and Through Walker v. Skiwski, 529 So.2d 184, 185 (Miss. 1988); Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971)... .
Hudson, 546 So.2d at 364.
In Freeze v. Taylor, 257 So.2d 509, 511 (Miss. 1972), we admonished attorneys against taking language from our opinions and creating jury instructions as was done in this case. This Court "does not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed." Payne v. Rain Forest Nurseries, Inc., 540 So.2d 35, 40-41 (Miss. 1989). In Payne, we held that "where it may be fairly charged that one or more instruction may have been confusingly worded, we should not reverse if other instructions clear up the confusing points ... On the other hand, where we find two or more instructions in hopeless and substantive conflict with each other, we often reverse." Id. (emphasis added).
If this Court were to settle for the "mere error of judgment" language as the controlling law in this state for medical malpractice cases, then most injured individuals could forget recovery. A physician or a professional can always claim that he was exercising his own judgment even though he was mistaken or negligent. There are many other ways to instruct the jury such that both sides receive an adequate instruction of the law and the facts as applied to the law.
What is expected from a physician is much more clear when viewed in traditional negligence language. In Day's case, there was only one method of correcting the problem, therefore, leaving no room for choice for the physician, and ultimately making a "mere error of judgment" instruction not only unnecessary, but absolutely inapplicable. The definition of "error," as it is generally known, means one of three things: an act, assertion or belief that unintentionally deviates from what is true; the condition of having incorrect or false knowledge; or the act or an instance of deviation from the accepted code of standard. The American Heritage Dictionary of the English Language 445 (1983). None of these three comport with the language in our standard of care requiring a physician to maintain a certain level of competence. Merriam Webster's Collegiate Dictionary 34 (10th ed. 1994) provides a similar definition  "an act or condition of ignorant or imprudent deviation from a code of behavior." A patient certainly does not pay a doctor to act imprudently. While it may seem rudimentary to cite to dictionaries, it is necessary to explain the everyday meanings attached to words, reflecting the notions a jury might hold.
The Oregon Supreme Court reversed its lower court's use of a similar instruction finding it to be confusing to a jury by stating:
[the use of such words] makes it appear that reasonable judgment is the crucial issue. It is not. In fact, reasonable judgment is irrelevant if the treatment option selected provides reasonable care. A doctor may not know that there is more than one treatment option or the doctor may adhere only to one opinion, unreasonably rejecting all others. In both of these instances, the doctor by ignoring or rejecting all other treatment options may not be exercising reasonable judgment. Nevertheless, the doctor is not liable for negligence *815 if the treatment furnished is consistent with reasonable care.
Rogers v. Meridian Park Hospital, 307 Or. 612, 772 P.2d 929, 933 (1989).
The Rogers Court further stated:
"to state that a doctor is not liable for bad results caused by an error of judgment makes it appear that some types of negligence are not culpable." It is confusing to say that a doctor who has acted with reasonable care has nevertheless committed an error of judgment because untoward results occur. In fact, bad results notwithstanding, if the doctor did not breach the standard of care, he or she by definition has committed no error of judgment. The source of the problem is the use of the word "error".
Id.
Lastly, the Rogers Court said that "if the term `judgment' refers to choices between acceptable courses of treatment, then the term `error in judgment' is a contradiction in itself. Use of any acceptable alternative would not be an `error' ... . such instructions not only confuse, but they are also incorrect because they suggest that substandard conduct is permissible if it is garbed as an `exercise of judgment'." Rogers, 772 P.2d at 933 (footnote omitted).
As recently as March, 1994, this Court exhibited a willingness to clarify its explanation of medical malpractice law by defining terms such as "reasonably prudent" and "minimally competent" as they exist within our standard of care:
The term "reasonably prudent speaks to the care and diligence that a professional must bring to a task. It is the same for all professionals persons. That is one must act reasonably or exhibit reasonable prudence under the circumstance. The term minimally competent is one which describes the degree of skill and knowledge that a professional must bring to the task. This is what is different about malpractice cases. A minimally competent physician, lawyer, accountant, etc., is one whose skills and knowledge are sufficient to meet the licensure or certification requirements for the profession or specialty practiced. That person is required to act as a reasonably prudent person with the required knowledge and skill would act in the same circumstances.
McCarty v. Mladineo, 636 So.2d 377, 381 (Miss. 1994). In McCarty, Justice Sullivan further stated that jury verdicts are to be based on two things: "the jurors' conclusions of fact, and the court's instructions of law." Id. In this case, the court instructed the jury on the traditional standard of care, but in the same breath, stated that the doctor's mere error of judgment would not make him liable. The jury cannot be expected to separate the two charges. Regardless of Morrison's error of judgment, he either acted as a competent physician would, or he did not. From four short words  "mere error of judgment"  citizens of our state would virtually be precluded from recovering in medical negligence actions due to a failure to meet the stringent requirement  an all encompassing preemptive instruction.

CONCLUSION
This Court now holds that the phrases "a competent physician is not liable per se for a mere error of judgment" and "good faith error in judgment or honest error in judgment" instructions should not be given in medical negligence cases because of their potential for confusing the jury. Negligence that results in injury should support a finding of liability by a jury regardless of whether the act or omission giving rise to the injury was caused by an "honest error in judgment". Because the lower court erred in granting D-11 and D-18, we reverse and remand for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
DAN M. LEE, P.J., and SULLIVAN, PITTMAN, BANKS and JAMES L. ROBERTS, Jr., JJ., concur.
HAWKINS, C.J., dissents with separate written opinion joined by PRATHER, P.J., and SMITH, J.
HAWKINS, Chief Justice, dissenting:
I respectfully dissent to the denial of the petition for rehearing.
*816 Instructions D-11 and D-18, upon which the majority reverses, are set forth in full in the majority opinion (pages 811-812); I will not repeat them here. The record shows that the circuit court amended D-11 as requested by plaintiff's counsel. (R.349-350) D-18 was objected to for including the clause, "a competent physician is not liable per se for a mere error of judgment." This simple statement in D-18 that a mere error of judgment in and of itself does not necessarily mean that a competent physician is legally liable is followed by the following fully explanatory language:
Instead, a physician has a duty to exercise such reasonable, diligent, skillful, competent and prudent care as is practiced by minimally competent physicians in the same specialty or general field of practice. Thus, even if you should find from a preponderance of the evidence that the Defendant, Dr. Morrison, was somehow mistaken in his treatment of Mr. Day or that the penile implant surgery may have been performed contrary to what Dr. Furlow would have done, you must return a verdict in favor of Dr. Morrison unless you are convinced from a preponderance of the credible evidence that in caring for and treating Mr. Day, Dr. Morrison failed to exercise that degree of reasonable diligence, skill, competence and prudence which is practiced with a minimally competent urologist under same or similar circumstances.
Plainly, the first statement about which the majority complains is followed by an explanatory statement fairly setting forth the legal standard under which Dr. Morrison was to be graded. Strangely, the majority gags at the gnat of the first statement, and simply ignores language fully explaining it.
Now, let us examine the plaintiff's own instructions:
P-2
Dr. Morrison is required by law to perform all facets of the surgery with that level of competence and diligence as might be expected of minimally competent surgeons under the circumstances.
The determination of whether Dr. Morrison exercised a level of competence and diligence of a minimally competent surgeon under the circumstances would exercise, is a question to be determined by the Jury taking into consideration the testimony of witnesses and other evidence.
If you find by a preponderance of the evidence, the crossover of the left cylinder into the right corpora occurred at the time of the operation, and that Dr. Morrison failed to detect the crossover and to correct it, you further find that a minimally competent urologist would have detected and corrected the crossover, then, you are instructed the Defendant, Dr. Morrison, committed medical negligence. If you further find that such medical negligence proximately caused injuries to Charles Day, then you are instructed to return a verdict for the Plaintiff, Charles Day, against the Defendant, Dr. Doyle Morrison, for damages, if any, as are described in the subsequent instructions.
P-4
The legal duty of surgeons in surgical procedures is to use reasonable and ordinary care as other surgeons in good standing would ordinarily exercise in like cases under nationally-recognized standards.
P-5
Recovery in a negligence action requires proof by a preponderance of the evidence of the following elements: duty, breach of duty, proximate causation and injury (i.e., damages). Mississippi physicians are judged by nationally-recognized standards of care; they have a duty to employ "reasonable and ordinary care" in their treatment of patients.
Where then, did defense instruction D-18 say anything differently from the plaintiff's instruction? Clearly, it did not. The only possible objection which could be raised to it would be it was repetitive of the plaintiff's instructions, hardly ground for reversal.
Until today if our law recognized anything, it was that the practice of medicine is not an exact science, not subject to the same mathematical certainty as engineering. Good doctors, just as good lawyers, do disagree, and there is no way of knowing prior to an event *817 which choice will be better in a particular case. There was no way in this case for the jury to be misled by this clause in the instruction. The instructions simply state that a competent physician is not liable for a mistake in judgment unless that mistake came from failure to exercise reasonable diligence, skill, competence and prudence which a competent urologist would have exercised under same or similar circumstances.
Surely not a day passes in the life of a busy physician in which he does not encounter choices to be made in the treatment of a patient with no way of knowing which is preferable beforehand. Should a physician be held liable if it is only in hindsight that it can be determined which choice was preferable? Of course not. This is all D-18 states.
As the majority notes, this Court in Hall v. Hilbun, 466 So.2d 856, 866 (Miss. 1985), used language embraced in the instruction, and in two later cases approved the language in medical practice instructions. Harris v. Shields, 568 So.2d 269 (Miss. 1990); Clayton v. Thompson, 475 So.2d 439 (Miss. 1985). Now, we suddenly brush these decisions aside. See also Hudson v. Taleff, 546 So.2d 359, 364 (Miss. 1989) (holding that physician not liable for every untoward result and not insurer of success); Dazet v. Bass, 254 So.2d 183, 187 (Miss. 1971) (holding that bad result does not establish liability).
Clearly, this clause in this instruction could not have caused the jury to deviate from the language contained in the plaintiff's own instructions. If there is reversible error in this case, it is not this defense instruction.
Defense counsel in this case followed law as enunciated by this Court, and if there was a clause in one of its instructions to which the majority objects, it was clearly harmless because its import was fully explained further in the instruction. Under these circumstances, if the majority has concluded that the clause is objectionable, basic fairness to the bench and bar dictates an admonishment not to use it in future cases, not reversal.
Is the majority holding that a competent physician who exercises reasonable professional care in looking after his patient is liable for a mere error in judgment unaccompanied by some negligent treatment? Seemingly so. Until today's decision, it was the failure to exercise that degree of care which a physician should have used which made the physician liable, not the fact that another physician might have chosen a different course, or that in hindsight one choice would appear to have been better than the other.
PRATHER, P.J., and SMITH, J., join this opinion.
NOTES
[1] The surgery places an inflatable cylinder on each side of the urethra in the penis. The surgeon inflates the prosthesis to ensure that it creates an erection. This procedure is done two or three times to determine that both cylinders are positioned properly in the left and right corpora.
[2] At trial, Dr. Furlow explained in great detail the surgical procedure of the penile implant. The "crossover" of the cylinders is the result of the inflatable prosthesis moving to one side of the penis. Supposedly, this occurs from a defect in the septum wall which divides one side of the penis from the other. Essentially, each cylinder must be positioned on both sides of the penis in order to function properly.
[3] Justice Sullivan, in McCarty v. Mladineo, 636 So.2d 377, 381 (Miss. 1994), defined the adjective "minimally" within the context of a medical professional. "Minimally" does not mean one can be a 20% doctor.