# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CT-01639-SCT

*RUBY LORENE BICKHAM, AS THE
ADMINISTRATRIX FOR THE ESTATE OF TAMARA
BICKHAM; CHRISTOPHER MATTHEW BICKHAM;
AND CHRISTOPHER MATTHEW BICKHAM, II, A
MINOR, BY AND THROUGH HIS NEXT FRIEND,
CHRISTOPHER MATTHEW BICKHAM*

*v.*

*DR. FRED Y. GRANT, DR. JOHN S. HARRIS, RUSH
FOUNDATION HOSPITAL AND RUSH MEDICAL
GROUP, P. A.*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 9/25/1997 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JAMES A. WILLIAMS |
| ATTORNEYS FOR APPELLEES: | MARK P. CARAWAY |
| | WILLIAM B. CARTER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | COURT OF APPEALS' JUDGMENT AFFIRMED AND CASE REMANDED FOR NEW TRIAL AS TO THE CLAIMS ASSERTED AGAINST DOCTORS GRANT AND HARRIS AND RUSH MEDICAL GROUP, P.A. - 09/11/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The heirs and estate of Tamara Bickham (collectively "Bickham"), deceased, filed this medical

negligence case in the Circuit Court of Lauderdale County, Mississippi against Dr. Fred Y. Grant ("Dr.

Grant"), Dr. John S. Harris ("Dr. Harris"), Rush Medical Group, P.A. ("Rush Group"), and the Rush Foundation Hospital ("Rush Hospital") (collectively "Defendants"). The jury found for the Defendants, judgment was entered in accordance with that verdict, and the trial court denied Bickham's motion for a JNOV or a new trial. The Court of Appeals initially affirmed the trial court's judgment. However, on motion of rehearing, the Court of Appeals conducted an extensive review, withdrew its prior opinion, and reversed and remanded for retrial limited to the Bickham's claims against Dr. Grant, Dr. Harris, and Rush Group. The Court of Appeals found that the trial court granted erroneous jury instructions regarding the standard of care. *Bickham v. Grant,* 2001 WL 570018 (Miss. Ct. App. 2001). On writ of certiorari, we affirm the Court of Appeals as to its reversal and remand for a new trial against Dr. Grant, Dr. Harris, and Rush Group based on the erroneous jury instructions and its affirmance of the judgment in favor of Rush Hospital.

### FACTS

¶2.    A week after giving birth to her son, Tamara Bickham began having difficulties. She sought treatment in the emergency room of the Rush Hospital on three separate occasions within a week period. Dr. Grant was the obstetrician-gynecologist on call during Bickham's last visit to the hospital on October 22, 1991. Bickham was admitted to the hospital and was diagnosed with endometritis, an inflamation of the inner layer of the uterine wall.

¶3.    After two days of treatment, Dr. Grant discovered a blood clot in Bickham's leg and prescribed Heparin. Dr. Grant monitored Bickham's condition through the use of a partial thromboplastin time test ("PTT") which compares the time it takes the patient's blood to clot with the clotting time for a control patient.

2

¶4.     During treatment, Bickham complained of difficulty breathing, leg pain, and chest pain. Her PTT scores were an average of 53, with an average score for the control group at 32. Twelve days after treatment began, Bickham's conditioned worsened. Dr. Harris was on call during this time. He immediately called Dr. Grant back to the hospital.

¶5.     On November 3, a nurse noticed Bickham had labored breathing. Dr. Grant then ordered a lung scan which revealed a large pulmonary embolus blocking the left lung and the lower lobe of the right lung. Dr. Grant immediately transferred Bickham to the University Medical Center ("UMC"). At UMC, Bickham underwent surgery to insert a "filter" or "basket" to prevent further blood clots. The treatment proved unsuccessful, and Bickham died on November 10, 1991.

¶6.     Bickham's husband, individually and as next of friend of their newborn son, together with the administratrix of her estate filed this medical malpractice action against Dr. Grant, Dr. Harris, the Rush Hospital, and Rush Group. After an eight-day trial, the trial judge allowed certain jury instructions to be read to the jury. Instruction C-20, as given to the jury, provided that:

> You are instructed that you have heard from the expert witnesses who have testified in the case differing views as to what would be the proper procedures to be followed by Doctors Grant and Harris in their treatment of Tamara Bickham. If you find from these opinions that two or more alternative courses of action would be recognized by the profession as being proper and within the standard of are and that Doctors Grant and Harris, **in the exercise of their best judgment**, elected one of the proper alternatives you should find for Doctors Grant and Harris.

(emphasis added). The jury returned a verdict in favor of the Defendants.

¶7.     Bickham's subsequent appeal was assigned to the Court of Appeals. Bickham argued that the trial court erred in denying the JNOV motion and in giving Instruction C-20 as it is a subjective instruction and is in conflict with this Court's holding in *Day v. Morrison*, 657 So.2d 808 (Miss. 1995). Originally, the Court of Appeals affirmed the trial court's ruling on Instruction C-20. However, on rehearing, the Court

3

of Appeals extensively reviewed the record, withdrew its prior opinion, and reversed and remanded for retrial limited to the Bickham's claims against Dr. Grant, Dr. Harris, and Rush Group determining that the trial court had granted an erroneous jury instruction on the standard of care. A petition for writ of certiorari was filed by the Defendants wherein they claim that the the Court of Appeals erroneously found Instruction C-20 to be reversible error.[1]

## DISCUSSION

¶8.     Jury instructions are to be read as a whole. *Southland Enterprises, Inc. v. Newton County*, 838 So.2d 286, 289 (Miss. 2003). The trial judge has considerable discretion in instructing the jury. *Id.* (citing *Splain v. Hines*, 609 So.2d 1234, 1239 (Miss. 1992)). A defendant is generally entitled to an instruction which presents his side of the case; however, such instruction must correctly state the law. *Humphrey v. State*, 759 So.2d 368, 380 (Miss. 2000) (citing *Heidel v. State*, 587 So.2d 835, 842 (Miss. 1991)). Furthermore, "[i]t would be error to grant an instruction which is likely to mislead or confuse the jury as to the principles of law applicable to the facts in evidence." *Southland Enterprises*, 838 So.2d at 289 (citing *McCary v. Caperton*, 601 So.2d 866, 869 (Miss. 1992)).

I.     **WHETHER THE COURT OF APPEALS ERRONEOUSLY FOUND INSTRUCTION C-20 TO BE REVERSIBLE ERROR.**

---

[1] The Defendants also assert that the Court of Appeals' majority opinion misapprehends the facts concerning Bickham's alleged blood clotting disorder which was allegedly diagnosed when she was seven years of age. Since these statements of fact have no bearing on our decision to affirm the Court of Appeals decision, we need not consider the merits of this issue. Suffice it to say, the Court of Appeals did in fact make three misstatements of fact, those being (1) Bickham's diagnosis with a blood clotting disorder at the age of seven; (2) information regarding Bickham's blood clotting disorder was a part of her medical records; and (3) the information regarding Bickham's blood clotting disorder was relied upon by the physicians in providing treatment.

4

¶9.    The Court of Appeals, on rehearing, found Instruction C-20 to be subjective and in conflict with this Court's holding in *Morrison*, 657 So.2d 808.  The Court of Appeals opined that just as this Court found the jury instruction involved in *Morrison* to be subjective and misleading, so too was Instruction C-20.  The Defendants argue that the Court of Appeals erred in its reasoning.  Specifically, they argue that Instruction C-20 merely instructed the jury on alternative treatments as evidenced by conflicting expert testimony and that the facts in *Morrison* are wholly distinguishable from the present circumstances.  Bickham, of course, agrees with the Court of Appeals' rehearing holding.

¶10.    In *Morrison*, the medical malpractice claim instituted by the plaintiff alleged negligence resulting from a penile prosthesis surgery and the defendant doctor's failure to diagnosis and treat the recurring problems which exhibited themselves as a result of the botched surgery. *Id.* at 809-11.  The facts in *Morrison* are not distinguishable from the present facts as asserted by the Defendants.  The holding in *Morrison* did not, as asserted by the Defendants, just center around the fact that there was only one method of treatment for the problems exhibited by the plaintiff, the penile prosthesis operation.  The negligence claim in *Morrison* not only dealt with the treatment, meaning the surgery, but also with the care given the plaintiff after the surgery which was claimed to be deficient and amounting to a failure to diagnosis and treat. *Id.* at 811.  Looking at the instructions in *Morrison* which were at issue, makes it clear that the doctor's treatment of the plaintiff not only encompassed the surgery itself, but also the seven months of followup treatment the plaintiff received. *Id.*  Ultimately, we held that the trial court erred in allowing a jury instruction in a medical malpractice action which held the physician not liable for a "mere error in judgment." *Id.*  We rejected "bona fide" or "good faith" judgment jury instructions in medical malpractice actions. *Id.*  Our reasoning was clear.  Such instructions create confusion with the jury and subject physicians to a

5

subjective and not an objective standard of care. We also found that such subjective standards could sway a jury to "conclude, incorrectly, that a physician is not liable for malpractice even if he or she is negligent in administering the treatment selected." *Id.* at 812 (quoting *Riggins v. Mauriello*, 603 A.2d 827, 831 (Del. 1992)). "The central issue in the ordinary negligence case is whether the defendant has deviated from the required standard of care, not his mental state at the time of the conduct which constitutes the deviation." *Id.* at 813 (quoting *Logan v. Greenwich Hosp. Ass'n*, 191 Conn. 282, 299, 465 A.2d 294, 303 (1983)). Additionally, we stated that:

> If this Court were to settle for the "mere error of judgment" language as the controlling law in this state for medical malpractice cases, then most injured individuals could forget recovery. **A physician or a professional can always claim he was exercising his own judgment even though he was mistaken or negligent.**

*Id.* at 814 (emphasis added).

¶11. Looking at the above language, there is no difference between the statement in *Morrison* regarding "exercising his own judgment" and "in their best judgment." It is clear that our decision in *Morrison* addressed not only the confusion of physician error and actionable liability, but also the inappropriateness of subjective standard jury instructions in medical malpractice actions.

¶12. Today, we are faced with a similar instruction, Instruction C-20. Instruction C-20 provides that:

> You are instructed that you have heard from the expert witnesses who have testified in the case differing views as to what would be the proper procedures to be followed by Doctors Grant and Harris in their treatment of Tamara Bickham. If you find from these opinions that two or more alternative courses of action would be recognized by the profession as being proper and within the standard of care and that Doctors Grant and Harris, **in the exercise of their best judgment**, elected one of the proper alternatives you should find for Doctors Grant and Harris.

(emphasis added). This instruction provides a subjective standard of care by the doctor regarding his own misdiagnosis. This is clearly what our holding in *Morrison* forbids. To charge juries with the responsibility

6

of assessing the mental state of treating physicians and to make a determination of liability is preposterous. Not to mention the negative effect such instructions will have on those injured. There is no conceivable way a jury weighing alternative treatments would possibly find physicians negligent for exercising **their best judgment**.

¶13. Instruction C-20's failure to include the word "error" does not lead to the conclusion that our holding in *Morrison* is not applicable. Instruction C-20 provides for an "**in the exercise of their best judgment**" standard of care. The word "judgment" is not in and of itself subjective. The word "judgment" used in connection with other words can certainly constitute a subjective jury instruction, as with the phrase "**in the exercise of their best judgment**." These words together, not alone, are what amounts to a subjective jury instruction.

¶14. Furthermore, a subjective jury instruction in a medical malpractice case is a misstatement of law, and as stated earlier a defendant is generally entitled to an instruction that presents his side of the case, if such instruction is a correct statement of the law. *Humphrey*, 759 So.2d at 380 (citing *Heidel*, 587 So.2d at 842). The appropriate standard of care in a medical malpractice case is objective and centers around exercising the degree of care, diligence, and skill ordinarily possessed and exercised by a minimally competent and reasonably diligent, skillful, careful, and prudent physician in that field of practice. What the physician may have been thinking in "his best judgment" is irrelevant. What the physician did in treating the patient is the key factor. Patients expect their physician to always be exercising "their best judgment." However, it is clear that there are times where the physician's best judgment regarding treatment falls below the applicable standard of care. This is why instructions such as C-20 are misstatements of law as they hold the physician to his own personal standard of care and not the standard of care applicable to physicians in his area of practice.

7

## CONCLUSION

¶15. Jury Instruction C-20 is an erroneous instruction as it is a misstatement of law regarding the applicable standard of care and is in conflict with our holding in ***Morrison.*** We affirm the Court of Appeals as to its reversal and remand for a new trial against Dr. Grant, Dr. Harris, and Rush Group based on the erroneous jury instructions and its affirmance of the judgment in favor of Rush Hospital.

¶16. **COURT OF APPEALS' JUDGMENT AFFIRMED AND CASE REMANDED FOR NEW TRIAL AS TO THE CLAIMS ASSERTED AGAINST DOCTORS GRANT AND HARRIS AND RUSH MEDICAL GROUP, P.A.**

**EASLEY AND GRAVES, JJ., CONCUR. PITTMAN, C.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J., WALLER AND CARLSON, JJ. DIAZ, J., NOT PARTICIPATING**.

**PITTMAN, CHIEF JUSTICE, SPECIALLY CONCURRING:**

¶17. I write today to voice my approval of the analysis of the deficiencies of instruction C-20 found in the plurality opinion. The instruction is indeed defective because it asked questions of the jury that it was not required to answer: e.g. whether an alternative procedure *not* performed by the doctors here would have provided care which fell below the standard of care we impose on physicians. The jury needed only to consider the much simpler question whether the procedure actually performed here fell below the standard of care. The Court of Appeals correctly noted the confusing nature of C-20 when it stated:

> we can discern no logical reason why it likewise would not be improper to give a "best judgment instruction" in instructing the jury regarding a physician's selection of an allegedly alternative course of action within the standard of care, *for in both cases the physician is to be exonerated only if he followed the standard of care, his good judgment or bad judgment notwithstanding*.

8

*Bickham v. Grant*, 2001 WL 570018, at *2 (Miss. Ct. App. 2001) (emphasis added).

¶18.    Therefore, I agree with the discussion of C-20 found in today's plurality opinion, but join the remainder of the opinion in result only.

### COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶19.    I agree with the affirmance of the judgment in favor of Rush Hospital, but I strongly disagree with the affirmance of the Court of Appeals' judgment's reversal based on the trial court's granting of jury instruction C-20 on the standard of care.  Although the jury instruction was inartfully drawn and is not a model instruction to be followed, it is not an erroneous statement of the law and does not conflict with this Court's holding in *Day v. Morrison*, 657 So.2d 808 (Miss. 1995).  The trial court's granting of C-20 was proper, and thus I believe the  Lauderdale County Circuit Court jury verdict should be affirmed.

¶20.    In many matters  which come before this Court, the choice of specific words and their relation to other surrounding words, whether in jury instructions or any other document, can be outcome determinative.  The case before us is a good example.  The plurality looks to the words "in the exercise of their best judgment" found in C-20, and finds reversible error.  With all due respect, I believe that the plurality simply "isn't seeing the forest for the trees."  Thus I write to distinguish the language found in C-20 from the objectionable language found by this Court in *Day v. Morrison*, 657 So.2d 808 (Miss. 1995).

¶21.    C-20 states in its entirety:

> You are instructed that you have heard from the expert witnesses who have testified in the case differing views as to what would be the proper procedures to be followed by Doctors Grant and Harris in their treatment of Tamara Bickham.  **If you find from these opinions that two or more alternative courses of action would be recognized by the profession as being proper and within the standard of care** and that Doctors Grant and Harris, **in the exercise of their best judgment elected one of the proper alternatives,** you should find for Doctors Grant and Harris.

(emphasis added).

¶22.    The plurality looks to ***Morrison***, a relatively recent precedent in which this Court held that it was improper to instruct a jury that "a competent physician is not liable per se for a mere error in judgment" or to refer to "good faith error in judgment or honest error in judgment." ***Id.*** at 815.  While acknowledging that ***Morrison*** was "by no means controlling because the issues are different," the Court of Appeals unfortunately failed to note that not only were the basic facts entirely different, but also much of what was said therein was dicta. In ***Morrison,*** unlike the present case, "there was only one method of correcting the [medical] problem, therefore leaving no room for choice for the physician, and **ultimately making a 'mere error of judgment' instruction not only unnecessary, but absolutely inapplicable**." ***Id.*** at 814 (emphasis added). The remainder of the ***Morrison*** opinion, however, cited extensive authority wherein the "mere error of judgment" language in an instruction had been criticized, and although dicta, it is instructive.

¶23.    A careful review of ***Morrison*** reveals that it focused on the confusion that may arise from informing jurors that even if the doctor committed "error", there still may not be liability.  Suggesting that only bad faith negligence -- as opposed to good faith error-- would justify an award of damages, was not a correct statement of the law.  ***Id.***  However, ***Morrison*** reiterated that failure of treatment does not equate to error, and a doctor is not a guarantor of success, citing the Oregon Supreme Court which held that "bad results notwithstanding, if the doctor did not breach the standard of care, he or she by definition has committed no error in judgment. The source of the problem is in the use of the word 'error'." ***Id.*** at 815 (quoting ***Rogers v. Meridian Park Hosp.***, 772 P.2d 929, 933 (Or. 1989)). The negligent failure to conform to a standard of care is not proven by a lack of success in treatment.  Exempting "errors in

10

judgment" misleads the jury in its duty to distinguish between the physician having merely failed because the treatment was unsuccessful and having negligently failed to conform to a standard of care.

¶24.    Although the word "judgment" is present in the instruction sub judice, it is not used in the context discussed in *Morrison*. *Morrison* pointed out that "reasonable judgment" is not the crucial issue, and stated that "reasonable judgment is irrelevant if the treatment option selected provides reasonable care." *Morrison*, 657 So.2d at 814 (quoting *Rogers*, 772 P.2d at 933). Thus the issue is whether reference to the doctors' "exercise of their best judgment" in instruction C-20, though potentially irrelevant, is also reversible error. *Morrison* states that bad judgment in failing even to consider other treatment options does not create liability if the option chosen provided reasonable care. Conversely, good judgment would not insulate a doctor from liability unless it was good judgment in the selecting of a course of action that is within the standard of care. Because the use of the word "judgment" in this instruction was coupled with choosing between different treatment choices that all were within the standard of care, as testified to by expert witnesses, there is no error.

¶25.    That having been said, I realize that for an analysis of this challenged instruction to be clearly understood, it is important to explain the factual context in which it is presented.

¶26.    Expert testimony was presented at trial regarding the fact that at the time of Ms. Bickham's treatment, a transition was occurring which ultimately resulted in a change of the standard of care with regard to use of anticoagulant medications. Thus, in my view, the most significant part of the instruction is the phrase "two or more alternative courses of action."

¶27.    Bickham's principal argument was that the two alternative treatment courses, both being within the standard of care, were not proven by the evidence. Bickham argues that there were two diametrically opposed views that simply could not both be considered within the standard of care. Indeed, in the

11

Bickham's brief is an accusation that the defendants' experts were committing perjury in expressing the opinions that they did.

¶28.    A careful review of the record reveals, however, that this was not the typical "battle of experts" in which each side finds competent physicians to testify regarding **the** standard of care, with one saying the actions or inactions of the physician were within the standard of care and the other saying they were not. The situation here placed the doctor in the position of deciding which of two accepted standards of care he should follow.

¶29.    It is important to note what the instruction C-20 did **not** state. It did not inform the jury that the divergent opinions expressed were, in fact, all within the standard of care. That decision was for the jury. Instead, the instruction indicated that more than one way to treat an ailment might be recognized by reasonable medical professionals "as being proper and within the standard of care." In addition, it did not state that the jury's task was to place all of the disagreements between expert witnesses into the "two or more courses of treatment" category or to place none of them. The instruction would have allowed jurors to conclude that some of the disagreements reflected alternative treatments in which both were within the standard of care, and other divergences between expert opinions could not be reconciled. An instruction not challenged on appeal (C-13) states that jurors must decide if expert opinions "are not sound, or that the opinion is outweighed by other evidence," and in those events they "may disregard the opinion entirely."

¶30.    Three representative examples of  what jurors might have considered under either of these instructions are:  whether at some stage the doctors should have tested for a blood disorder; whether a PTT score of one  and a half times the baseline, or two and a half times, was the proper ratio; and whether a separate drug should have been administered sooner.  The problem with Bickham's PTT measurements may have been that she suffered from a blood disorder called antithrombin-III (AT-III) deficiency.  There

12

was testimony from the defendants' experts that in 1991 when this treatment was occurring, testing for AT-III was not within the standard of care when administering Heparin. Bickham's doctors indicated that testing for the disorder should have occurred once evidence was gained that Heparin was not succeeding. A specific instruction (C-17) informed the jury that it was to decide whether failure to discover this disorder was within the exercise of reasonable care.

¶31.    There was expert testimony that in 1991 the proper method for administering Heparin therapy was to maintain a PTT score of one and a half to two times the control value. That ratio was maintained here. There was also testimony that beginning in 1991 a significant clinical trial was undertaken at forty medical universities to determine what the proper ratio should be. A control group that was maintained on that baseline was part of the experiment, while other groups received higher dosages. These were two different treatment programs, two regimens, that the jury properly could find were both within the standard of care. Doubts may have existed that led to the clinical trials, but that does not mean that only one approach was within the standard of care.

¶32.    With that evidentiary background, examination of the validity of the instruction's reference to two courses of action can proceed. Mississippi adheres to a national standard of care in medical malpractice cases. *Hall v. Hilbun*, 466 So.2d 856, 873 (Miss. 1985). As *Morrison* recognized, there may be more than one treatment option for a medical problem. If the physician chooses one of the reasonable treatment options within the standard of care, that choice does not create liability. *Morrison*, 657 So. 2d at 814-15.

¶33.    A statement of the law consistent with these principles is this:

> Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a

13

considerable number of recognized and respected professionals in his given area of expertise.

*Jones v. Chidester*, 610 A.2d 964 (Pa. 1992).

¶34.    There was testimony from defense experts which contradicted testimony from Bickham's experts. Whether competent medical authority was indeed divided on the proper course of treatment was as much a question of fact for the jury as was the determination of whether the course of treatment followed was within the standard of care. Here, the jury verdict necessarily meant that the course of treatment taken by the defendants was within the standard of care. Whether the jury also would have found that the opinions expressed by the Bickham's experts were consistent with the standard of care is unknown and irrelevant for our purposes. In my view, the instruction that led to this jury verdict was not an erroneous one. In this specific, narrow context, I submit that the use of the phrase "in the exercise of their best judgment" is NOT the fatal flaw which the plurality finds it to be under *Morrison*. The jury obviously placed greater credibility on experts than Bickham's experts. "When evidence is conflicting, we defer to the jury's determination of the credibility of witnesses and the weight of their testimony." *Ducker v. Moore*, 680 So. 2d 808, 811 (Miss. 1996). In this case, the search for truth focused on a battle of the experts, each armed with a particular view of the parties' conflicting theories as to how Bickham's death occurred. After hearing all the testimony, the jury, as the ultimate trier of fact, rendered its verdict.

¶35.    Finally, it is important to note that instruction C-20 is not to be considered in a vacuum. The instructions as a whole are examined to determine if the jury was properly instructed. *Payne v. Rain Forest Nurseries, Inc*., 540 So.2d 35, 40-41 (Miss. 1989). Instructions C-5, C-11, C-13 and C-16 noted above, provided additional and consistent guidance, and none of them are criticized on appeal. Instruction C-16 informed the jury that the doctors must possess the "degree of care, diligence and skill

14

as is ordinarily possessed by minimally competent and reasonably diligent, skillful, careful and prudent obstetrician practicing throughout the United States." In addition the instruction informed the jury that the doctors actions must be examined under the circumstances as they existed during their treatment of Tamara Bickham, not using hindsight.

¶36.    Instruction C-5 instructed the jury as to the steps that it must take to find for Bickham. In essence the jury had to find that Dr. Grant failed to exercise the requisite degree of care and skill required by a minimally competent and qualified obstetrician-gynecologist, and that his failure to exercise such skill and care was the cause of Tamara Bickham's death. This instruction makes it clear that the jury must judge Dr. Grant's *professional* actions and decisions.

¶37.    C-13 instructed the jury that it must decide if expert opinions are not sound, or that the opinions are outweighed by other evidence, and that in those events it may disregard the opinion entirely.

¶38.    Finally, Instruction C-11 instructed the jury that it must return a verdict for Bickham if it found that Drs. Grant and Harris did not meet the minimal requirements of competence by failing to properly diagnose, or properly treat, or properly monitor the treatment, or order the proper diagnostic tests or timely consult specialists about thrombophlebitis and pulmonary embolism.

¶39.    Accordingly, I believe that the trial court did not err in giving Instruction C-20 here. The conflicting expert testimony could reasonably be found by the jury to represent two courses of treatment available to Drs. Grant and Harris, from which a choice needed to be made. As *Morrison* discusses, the physicians do not even need to be aware of all possible treatments if they choose one that is within the standard of care. *Morrison*, 657 So.2d at 814-15. The jury instructions as a whole adequately informed the jury that the doctors were to be examined for their professional judgment.

15

¶40.    Although C-20 is not a model instruction to be followed, and certainly could have been more artfully drawn, its presentation to the jury did not constitute reversible error.

¶41.    In my view, the jury was adequately instructed. The granting of Instruction C-20 was not reversible error. The decision of the Court of Appeals should be reversed as to Drs. Grant and Harris and Rush Group and the judgment of the Lauderdale County Circuit Court reinstated.

¶42.    For these reasons, I concur in part and dissent in part.

**SMITH, P.J., WALLER AND CARLSON, JJ., JOIN THIS OPINION.**