# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-CA-01639-COA

**RUBY LORENE BICKHAM, AS ADMINISTRATRIX FOR THE ESTATE OF TAMARA BICKHAM; CHRISTOPHER MATTHEW BICKHAM AND CHRISTOPHER MATTHEW BICKHAM II, A MINOR, BY AND THROUGH HIS NEXT FRIEND, CHRISTOPHER MATTHEW BICKHAM**                    **APPELLANTS**

**v.**

**DR. FRED Y. GRANT, DR. JOHN S. HARRIS, RUSH FOUNDATION HOSPITAL AND RUSH MEDICAL GROUP, P. A.**                    **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/25/1997 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JAMES A. WILLIAMS |
| ATTORNEYS FOR APPELLEES: | MARK P. CARAWAY |
| | WILLIAM BENNETT CARTER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | AFTER A TRIAL, THE JURY ENTERED A VERDICT FOR ALL THE DEFENDANTS. |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 5/29/01 |
| MOTION FOR REHEARING FILED: | 6/13/2001; denied 4/16/2002 |
| CERTIORARI FILED: | 4/30/2002; granted 10/10/2002 |
| MANDATE ISSUED: | |

### ON MOTION FOR REHEARING

EN BANC

IRVING, J., FOR THE COURT:

¶1. The motion for rehearing is granted. The original opinion is withdrawn, and this opinion is substituted.

### STATEMENT OF THE CASE AND ISSUES

¶2. Ruby Lorene Bickham, as administratrix for the estate of Tamara Bickham, Christopher Matthew Bickham and Christopher Matthew Bickham II, a minor, by and through his next friend, Christopher Matthew Bickham (hereinafter collectively referred to as Bickham) filed a medical malpractice suit against Dr. Fred Grant, Dr. John S. Harris, Rush Medical Group, P.A. and Rush Foundation Hospital (RFH) stemming from the death of Tamara Bickham.

¶3. The case was tried before the Circuit Court of Lauderdale County, and the jury returned a verdict in favor of all defendants. Bickham now appeals and raises the following issues which are taken verbatim from Bickham's statement of the issues:

**1. WHETHER THE TRIAL JUDGE MAKES IMPERMISSIBLE COMMENT ON THE EVIDENCE WHEN HE INSTRUCTS THE JURY THAT THE EXPERTS FOR THE DEFENDANTS HAVE PRESENTED TESTIMONY OF AN ALTERNATIVE TREATMENT METHOD AND IF THE DOCTOR USED HIS "BEST JUDGMENT" IN CHOOSING A TREATMENT AND IT RESULTED IN DEATH HE IS NOT LIABLE.**

**2. WHETHER, WHEN HIGHLY REPUTABLE EXPERTS FOR THE PLAINTIFFS TESTIFY THAT THE DEFENDANT DOCTORS IGNORED COMMON AND ORDINARY SIGNS AND SYMPTOMS, FAILED TO ORDER DIAGNOSTIC TESTS AND ALLOWED THE DISEASE TO GROW, WITHOUT GETTING A CONSULT AND DEFENDANTS OFFERED ABSURD AND HIGHLY RISKY EXPLANATIONS OF WHEN TO GET A CONSULTATION, THEN A JURY VERDICT FOR THE DEFENDANTS IS AGAINST THE OVERWHELMING WEIGHT AND CREDIBILITY OF THE EVIDENCE AND A NEW TRIAL SHOULD BE GRANTED.**

**3. WHETHER THE PLAINTIFFS WHOSE DECEASED WAS ASSIGNED BY THE HOSPITAL TO A PHYSICIAN WHEN SHE APPEARED AT THE HOSPITAL EMERGENCY ROOM AND THE HOSPITAL HAS RULES AND REGULATIONS THAT CONTROL AND DIRECT THE PHYSICIAN AND MAKE MANDATORY THAT HE ATTEND TO ER ADMISSIONS AND OTHERWISE THROUGH BUILDING CONSTRUCTION, ADMISSION FORMS, PUBLIC ADVERTISING AND USE OF THE HOSPITAL "LOGO" REPRESENT TO THE PUBLIC THE DOCTOR IS ITS DOCTOR THEN APPARENT AUTHORITY OR OTHER AGENCY PRINCIPLES APPLY AND THE ISSUE OF AGENCY AND RESPONDEAT SUPERIOR SHOULD HAVE BEEN GIVEN TO THE JURY.**

¶4. Finding merit in Bickham's first issue, not because the complained of instruction was a comment on the evidence but because it improperly instructed the jury regarding the standard of care, we reverse and remand for a new trial as to the physicians and Rush Medical Group, P.A. but affirm as to Rush Foundation Hospital.

**FACTS**

¶5. On October 6, 1991, eighteen year old Tamara Bickham gave birth to Christopher Matthew Bickham, II at RFH. After her discharge, she experienced difficulties which resulted in her return to the emergency room at RFH on October 15 and 18. The diagnosis on October 15 was that Tamara was suffering from a bladder infection. She was given an antibiotic. When she came into the emergency room on October 18, her chief complaint was chest pain and complaints of hurting to breathe. She also had a breathing rate above twenty breaths per minutes when the normal breathing rate is twelve to sixteen breaths per minute. The diagnosis was not changed, but she was prescribed a different antibiotic. Neither Dr. Grant nor Dr. Harris saw Tamara on October 15 and 18. A third trip to the emergency room on October 22 resulted in her being admitted with a diagnosis of endometritis, a pelvic infection. Dr. Fred Y. Grant began treating her on October 22 and continued to do so until November 3, when he transferred her to the University Medical

Center (UMC). One week after her arrival at UMC, she died as a result of complications from a massive pulmonary embolus. The treatment, or lack thereof, provided by Dr. Grant with the assistance of Dr. Harris, forms the crux of this appeal.

¶6. Dr. Robert Batson, a vascular surgeon at the West Jefferson Medical Center in Marrero, Louisiana, and Dr. Paul Summers, an obstetrician/gynecologist at the University of Utah School of Medicine, testified as experts on Bickham's behalf. Dr. John Morrison, chairman of the department of obstetrics and gynecology at UMC, and Dr. John Clay, a hematologist/oncologist, testified as expert witnesses for the defendant physicians, Rush Medical Group, P.A. and RFH. Additionally, Drs. Grant and Harris testified in their own behalf, although Dr. Grant was called as an adverse witness by Bickham.

¶7. Bickham's experts and the physicians' experts all agreed that the medical community recognized and accepted heparin as the drug of choice for the treatment of a person with a deep vein thrombus. However, they disagreed as to: (a) the timeliness of the diagnosis (b) the necessity to screen for diseases which cause clotting, (c) the need for establishing a PTT baseline, (d) the value of the PTT readings, and the range indicative of effective heparin therapy, (e) the propriety of administering coumadin along with heparin, and (f) the presence of indicia that the clot was spreading, and the propriety of conducting a lung scan and installing a filter into Tamara's vena cava.

¶8. To aid the understanding of the rationale for our holding, we compartmentalize and set forth additional facts as follows:

### 1. The Diagnosis and Administration of Heparin Therapy

¶9. On October 24, Dr. Grant diagnosed Tamara with thrombophlebitis, also called deep vein thrombus. However, Dr. Summers, testifying for Bickham, was of the opinion that the failure of Dr. Grant to make the diagnosis prior to that time fell below the standard of care. It was Dr. Summers's opinion that Tamara may have had the beginnings of clotting in the pelvis as early as October 15, and if, on October 22, Dr. Grant had reviewed Tamara's emergency room records for October 15 and 18, he would have arrived at a more accurate and timely diagnosis.

¶10. After diagnosing Tamara with thrombophlebitis, Dr. Grant began the administration of heparin. All experts agreed that heparin, properly administered and in the absence of any medical impediments of the patient, will thin the patient's blood and prevent the spread of clots to other parts of the body, particularly the lungs where they could be fatal. All experts agreed that the initial infusion of heparin given by Dr. Grant, 5,000 units of IV bolus with 1,000 units per hour thereafter, is the typical dose and within the standard of care, at least initially. Further, all experts agreed that if heparin therapy alone does not stop the clotting other measures can and should be taken. But, as stated, the experts disagreed as to what should be done prior to the initiation of heparin. That will be discussed now.

### 2. Screening for Blood Clotting Abnormalities

¶11. Dr. Grant did not test Tamara for AT-III deficiency prior to commencing the administration of heparin. AT-III is short for antithrombin-III which is a chemical in everyone's blood that assists in maintaining the liquidity of the blood. Tamara Bickham was diagnosed with AT-III deficiency at age seven. This information was a part of her medical records, but her records were never consulted by Drs. Grant and Harris. Consequently, they were never aware of this condition. Bickham's experts testified that the failure of

the physicians to consult Tamara's prior medical records constituted a failure to adhere to the standard of care, while experts for the physicians testified that such failure did not constitute a breach of the standard.

¶12. Bickham's expert, Dr. Summers, testified that Dr. Grant should have done an AT-III screening test prior to starting the heparin to check for any abnormalities which might hinder the effectiveness of the heparin therapy. This is because the accuracy of the screening test is significantly compromised after the introduction of heparin. He explained that some of the conditions that can cause a clot will respond to heparin, and some will not. He explained further that AT-III is one of the chemicals in the blood which has to be present in ample supply for heparin to be effective. Otherwise, the patient will have clots, and the heparin will not correct the problem. It was his opinion that Drs. Grant and Harris fell below the standard of care for not doing the AT-III screening because the information to be gained from doing such a test would be helpful in making a determination why clotting continued during the heparin therapy.

¶13. Dr. Batson, Bickham's other expert, testified Dr. Grant should have recognized that Tamara presented the characteristics of AT-III deficiency. He stated that while AT-III deficiency is considered to be an unusual condition, it is not unusual in circumstances involving healthy young people below the age of thirty who have unusual clotting, are resistant to heparin, have had either surgery, trauma, childbirth or infection and have clots spreading all over. In such a case, according to Dr. Batson, AT-III deficiency is not rare. It is very common in that particular setting, and Tamara met all of the criteria.

¶14. Dr. Batson explained that AT-III is a component of human blood. It is a natural anticoagulant that keeps the blood liquid. Heparin works by latching on to the AT-III, changing its shape and enabling it to thin the blood. AT-III deficiency inhibits the effectiveness of heparin. This inadequacy can be compensated by infusing more AT-III into the blood or by using a different blood thinner such as coumadin which also stimulates the body to produce more AT-III. Dr. Batson explained further that fresh blood plasma, which is readily available, is a natural source of AT-III. It was Dr. Batson's opinion that the failure of Dr. Grant to either administer coumadin, fresh blood plasma, or get a consult from a specialist was an indication that Drs. Grant and Harris fell below the standard of care.

¶15. Doctors Morrison and Clay, the physicians' experts, gave testimony that was the exact opposite of Bickham's experts as to whether the 1991 standard of care required the administration of an AT-III screening test prior to administering heparin, and the administering of coumadin along with heparin.

¶16. Dr. Morrison testified that AT-III screening was not required by the standard anywhere in the country. He said there are many abnormalities that interfere with blood clotting and AT-III deficiency is one, as well as protein-c deficiency and protein-s deficiency. He further opined that even if the screening had been done, it would not have been reliable because Tamara had already been diagnosed with a clot. Dr. Morrison testified that in his opinion, "Tamara had something rare wrong with her blood that would not allow it to respond to heparin." He said it could have been AT-III, protein-c or protein-s deficiency or any other hematologic problem but he could not tell which one. He stated that "not one textbook such as *Williams*, *Caraton* or *Roberts* will tell you to do an AT-III test when a patient has thrombophlebitis." When asked if he knew Dr. Grant had attended a meeting in Dallas, Texas where Grant was given a syllabus advising physicians to consider, for diagnostic purposes, the presence of a thrombotic disorder in cases of women who present with thrombotic disease unusual in character and/or severity or who do not respond to anticoagulant therapy such as heparin, he responded, "No." Dr. Grant had in fact attended such a meeting and had been given a syllabus containing that admonition.

¶17. Dr. Clay, the physicians' other expert, testified that one is never required to screen for blood disorders before starting heparin therapy. He stated that when you have a young patient who is immediately postpartum, the protein-c and protein-s levels are low. A clot lowers the AT-III, protein-c and protein-s levels. When heparin is administered, the levels are lowered even further. He further stated that it is never proper to diagnose the blood disorder ahead of time, and that one cannot learn anything from drawing levels at the initiation of therapy.

### 3. *Establishment of PTT Baseline*

¶18. Dr. Grant did not do a blood test to determine Tamara's PTT baseline before commencing the heparin therapy. PTT is an acronym for partial thromboplastin time and refers to how long it takes one's blood to clot, thus providing information on how thin one's blood is at any given time. The experts disagreed as to whether the standard of care required the establishment of a personal PTT baseline control prior to the initiation of heparin therapy. The control is the average clotting range of a person's serum without any blood thinner in it, and the physician uses this figure to monitor how the blood thinning process is progressing after the introduction of a blood thinner in the blood. According to Drs. Batson and Summers, experts for Bingham, a PTT blood test should have been administered by Dr. Grant prior to commencing the heparin therapy to establish Tamara's PTT baseline control, and the failure to do so constituted a failure to adhere to the standard of care.

¶19. Drs. Morrison and Clay, experts for the defendant physicians, said the standard of care did not require the establishment of a personal PTT baseline control and that the control for a normal person's blood, from 23-35, could be used. The control used in Tamara's case was that for a hypothetical normal person and was set at 32. The physicians' experts were of the opinion that the defendant physicians did not violate the standard of care on this point.

### 4. *PTT Levels after Commencement of Heparin*

¶20. Drs. Morrison and Clay, the physicians' experts testified that with a patient who has a deep vein thrombus, the goal is to get the patient in therapeutic range within the first twenty-four to forty-eight hours, while Bickham's experts testified that the goal is to obtain therapeutic range within the first twenty-four hours. All experts agreed that PTT levels should be checked every four to six hours. However, the two groups of experts disagreed as to the acceptable therapeutic range in 1991.

¶21. Bickham's experts testified that the 1991 therapeutic range was two to two and one-half times the patient's personal control, but that the standard of care was moving toward one and one-half to two times the control. On the other hand, the physicians' experts testified that the 1991 standard of care called for one and one-half to two times the control of a hypothetical normal person.

¶22. When Tamara's PTT level was taken approximately six hours after the initial bolus, her PTT level was 33, well below what it should have been with her having received the bolus just six hours earlier. No additional heparin was given at this time. Further, PTT's were not taken consistently every four to six hours after initiation of the heparin therapy, as all experts agreed should be done. On one occasion, a PTT was not taken for approximately twenty-six hours. Of course, during this period it was impossible for the physicians to know whether Tamara's blood was thinning or continuing to clot. During Tamara's stay at RFH, she never had a sustained therapeutic PTT level.

¶23. RFH had a protocol for the administration of heparin. Dr. Grant did not know about the protocol when he started Tamara's heparin treatment and did not initially follow the protocol when Tamara's PTT fell below therapeutic range.

¶24. However, the physicians' experts dismissed the failure of Dr. Grant, on one occasion, to order an additional infusion of heparin on the basis that sometimes a physician may want to wait and see whether the patient's blood will equilibrate on its own. Therefore, they did not see any improper conduct on Dr. Grant's part, despite the fluctuations in the PTT levels below the therapeutic range.

¶25. Bickham's experts testified that the PTT chart was meaningless because the readings were based on the control of a hypothetical person as opposed to being based on Tamara's personal control.

### 5. *The Propriety of Administering Coumadin*

¶26. Dr. Grant undertook no course of action to determine why the heparin was not providing a sustained therapeutic level and instituted no measures to prevent the clot from spreading to Tamara's lungs other than giving her more heparin from time to time when her PTT fell below therapeutic level.

¶27. The two groups of experts were in total disagreement as to whether a second blood thinner, coumadin, should have been administered along with the heparin. Bickham's expert, Dr. Summers, said that Dr. Grant should have given Tamara a second blood thinner, to compensate for the ineffectiveness of the heparin, and the failure to do so constituted a breach of the standard of care. He opined that coumadin should have been started the second or third day after initiating of the heparin therapy. Dr. Batson testified that heparin was given in such a dose that complete anticoagulation or complete blood thinning was not accomplished to any consistent degree. He stated that coumadin should have been administered within twenty-four to forty-eight hours, and seventy-two hours at the most, after starting heparin, not ten days later as was done in this case just immediately prior to the transfer to UMC. He said coumadin also stimulates the body to make more AT-III. So, coumadin should be used in every case. On cross-examination the following exchange took place:

> Q. Doctor would you agree with me that the standard of care for giving coumadin is that the patient should be started on coumadin ten to twelve days afer heparin has been started, and the patient is started on coumadin or some other oral anticoagulation?

> A. No, sir, not only would I not agree with that, that is absolutely ridiculous. It's wrong and there is no justification for that anywhere. The reason is very simple. People with thrombophlebitis usually are in the hospital about seven to ten days. That would be the average across the country. Now, it takes four or five days to get coumadin regulated because it works through the liver through Vitamin K. So if you take a coumadin pill, it doesn't have any immediate effect at all on blood thinning. It takes four or five days to regulate it. If you start coumadin after day 13, and it takes five more days to regulate it, they are going to be in the hospital 18 days. So that is absolutely preposterous to say that you should wait ten to 13 days to start coumadin. It should be started-- the standard of care is that it must be started within 24 or at the most 72 hours after starting heparin therapy, not ten to 13 days afterwards, simply ridiculous.

¶28. As to whether coumadin should have been started as testified to by Bickham's experts, Dr. Morrison stated that coumadin should not have been used in the initial phase. He stated that it would have been

below the standard of care to give both heparin and coumadin at the same time, that the standard of care called for just heparin, not both heparin and coumadin because the giving of both heparin and coumadin would have put the patient at additional risk, that coumadin is hard to regulate and that it should only be used in extraordinary circumstances. He did acknowledge, however, that coumadin may be given after one has been fully anticoagulated. In such a case, the heparin is slowly stopped, and the patient is switched to coumadin therapy.

¶29. Dr. Clay, the defendant physicians' other expert, said the proper way is to anticoagulate the patient first with heparin and later with coumadin. He did not say exactly what he meant by "later," although he gave further explanation as follows:

> There is [sic] several problems that are not common but that young -- if they -- if-- but when you have a young person who has had a child, immediately after the birth of that child there is a decrease in protein-s levels. And this is a -- one of the things that helps balance the clotting versus the anti-clotting effect in the blood. And it is an anti-clotting and when the body is depleted after pregnancy and with protein-s and also with protein-c, and Coumadin affects those tremendously right at first. It further depletes those proteins and will cause a paradoxical over-clotting for the first few days. And you always want to give the Coumadin for- give Heparin first, particularly, in a young person who may have a deficiency of one of those, particularly someone right after the birth of a baby. You have to have the person anticoagulated, or you should have them anticoagulated with heparin first before coumadin is started or else you may end up aggravating the clotting situation. There is other clotting factors that coumadin affects that have longer half lives or longer periods that they will survive in the blood that coumadin ends up working on. That takes about five days, but the protein-c and protein-s have short half lives as opposed to, say, this other factor ten and your --and factor ten is what we are trying to break up. So you end up with a paradoxical over clotting for the first few days on coumadin. In this setting, it would have been wrong to do that.

### 6. The Spreading of the Clot and the Propriety of Doing a Lung Scan and Installing a Greenfield Filter or Basket

¶30. All experts agreed that *Williams Obstetrics* is an authority in the field and that it teaches that if someone has pulmonary embolism, or clots in the lungs, one of the ways to make the diagnosis is to do a lung scan. If the lung scan is inconclusive, an angiogram, which is more accurate than a lung scan, should be done. *Williams Obstetrics* also points out that a well recognized study of the clinical findings in a large number of individuals with angiographically identified pulmonary embolism revealed that the common abnormality was a respiratory rate of greater than sixteen breaths per minute. They emphasized that its frequency was so striking that a lower respiratory rate should rule against the diagnosis of pulmonary embolism.

¶31. The average breathing rate for human beings is twelve to sixteen breaths per minute. On October 22, the day that Tamara was admitted to Rush Foundation Hospital and came under Dr. Grant's care, the first respiration reading taken at around 8:00 a.m. showed her with a breathing rate of twenty breaths per minutes. At around noon, her respiration rate went to thirty-five. At approximately 4:00 p.m., her respiration rate was thirty where it remained until midnight when it stabilized at about twenty-five. Early the next morning it went up to forty. Her respiration rate was never below twenty during her entire hospitalization. On October 23, at 11:30 a.m., she had a respiration rate of twenty-four. At 3:30 p.m. in the

afternoon, her respiration rate went up to thirty-two. At 7:30 p.m., her respiration rate went up to forty. In addition to elevated respiration rates on October 23, Tamara also complained of pain in her right side upon respiration. Monday, October 28, when she complained of pain in her right leg, her respiration rate was twenty-four. Thursday, October 31, at 12:00 a.m., her respiration was twenty-four, and she had pain in both thighs.

¶32. During this entire time of Tamara's breathing difficulties and complaints of pain, Dr. Grant chose not to order a lung scan but chose instead to monitor her for the possibility of a pulmonary embolus by performing chest x-rays, listening to her lungs, looking at her arterial blood gases and utilizing general clinical observations. It was the opinion of Bickham's experts that Tamara's constant complaints of pain in specific areas, her respiratory rate, the fact that she had recently given birth to a child and her obesity, all combined, should have alerted Dr. Grant to the fact that the heparin was not working and Tamara's clot was probably spreading to other parts of the body, even the lungs. However, the physicians' experts and Dr. Grant offered other explanations for Tamara's symptoms and did not draw the conclusion that the symptoms implicated a failure of the heparin therapy or a spread of the clot.

¶33. Dr. Grant said that at approximately 1:30 p.m. on November 3, he suspected Tamara had a pulmonary embolus. However, he did not consult with a pulmonologist until 4:55 p.m. At 5:00 p.m., he ordered a lung scan, the first such scan ordered by him during Tamara's fourteen-day stay at RFH. The lung scan showed she had a pulmonary embolus. All blood flow to the left lung was completed blocked, and the major blood flow to the lower part of the right lung was blocked, with scattered clots in the upper part of the right lung. He and Dr. Alexander, the consulted pulmonologist, agreed that Tamara should be transferred to the UMC to have a basket installed in Tamara's vena cava. She was transferred at 7:00 p.m. on November 3, and the following day, the physicians at UMC determined that Tamara had clots in both legs, all through her vena cava, and all the way up the middle of her body.

¶34. According to Bickham's experts, a secure diagnosis is paramount in the management of pulmonary embolism and deep vein thrombosis, and clinical impression alone is unreliable. Objective imaging tests are essential to avoid serious diagnostic errors. The experts said that pulmonary embolism is not diagnosed by chest x-ray, is not diagnosed well by arterial blood gases (ABG's), and is most easily diagnosed with a lung scan.

¶35. Dr. Grant agreed that *Williams Obstetrics* states that one of the ways to make a sure diagnosis for pulmonary embolism is to do a lung scan and if it comes back inconclusive, to do an angiogram. However, the following colloquy occurred when asked about what he would have done on October 22, 1999, if he suspected Tamara had a pulmonary embolus:

Q. Had you believed that she had a clot in her lungs on the 22nd the appropriate tests that you would have done would have been a lung scan, true?

A. Not necessarily, that I would have to go straight to a lung scan. There are varied symptoms of a pulmonary embolus. Sometimes you would get arterial blood gases.

Q. Doctor, don't you know as basic medicine that doing an ABG is not diagnostic for clots in the lung? Don't you know that?

A. Nor is any test one hundred percent diagnostic.

Q. I'm not talking about one hundred percent. Doesn't the book say that doing the ABG is not diagnostic. In other words, you can't look at that and know whether or not someone has clots in the lungs. Don't you know that?

A. No, I don't know that, because that's not necessarily true. Your arterial blood gases are very important tests to allow you to assess a patient's oxygen status. And also, from that gather whether or not they may or may not have a pulmonary embolus. So I absolutely disagree with your statement.

Q. Isn't it true that you can have normal ABG tests and still have clots that have gone to the lung.

A. Yes, that is true. But you can have a lung scan that will be normal. You could have such small clots that even the definitive tests of an angiogram might be normal.

Q. Can you point to any case in any book, anywhere, where it says that, can you?

A. I don't have to point to a book.

Q. So, we are just having to rely upon what your word is; isn't that true?

A. Yes.

¶36. Bickham's experts testified that the lung scan should have been done long before it was and that there were many opportunities for Dr. Grant to realize that a lung scan was indicated. Dr. Summers testified that a scan should have been done as early as October 15 and certainly on October 22 when Tamara came under Dr. Grant's treatment. Both of Bickham's experts testified that the standard of care required conducting such a scan and conducting it at an earlier time based on Tamara's symptoms.

¶37. Dr. Batson testified that the lung scan should have been done three, four, five, even ten days earlier and was of the opinion that when the clot began progressing, enlarging, or spreading to other parts of the body, the defendant physicians took no measures to prevent the clot from breaking off and traveling through the right side of the heart into the lungs. He said some sort of filter device should have been placed into the main vein in the abdomen, the vena cava, to prevent the clot from entering the lung and heart.

¶38. Doctors Morrison and Clay, the physicians' experts, testified that a lung scan was not required at the time the leg clot was diagnosed because there were no indications of a pulmonary embolus prior to November 3, 1991. They based their opinion on the fact that when the nurses called Dr. Grant on November 1, 1991, Dr. Grant listened to Tamara's lungs, and ordered a chest film and an arterial blood gas test. Dr. Grant also observed Tamara eating a full meal, and she did not experience any shortness of breath. Further, the blood gas test did not show a decrease in oxygen content until November 3, 1991. Morrison further testified that after Dr. Grant obtained a low reading of the blood gas on November 3, 1991, Dr. Grant took the appropriate steps in consulting a pulmonologist.

¶39. Morrison stated that, in his opinion, it would have been life-threatening to put in a basket before Tamara "threw" the first pulmonary embolus. He stated that if you look in the textbooks, or the ones used at UMC and even from his training and experience, "for just thrombophlebitis you treat with heparin, the filter is not indicated." He stated that baskets are permanent. They cannot be pulled out. If the basket is turned wrong, it can cause clotting and one would die instantly. He stated that vascular surgeons will tell you that the basket should not be installed unless you are sure that this is the only alternative, such as on November

3 when Tamara had a pulmonary embolus. Tamara had a major pulmonary embolus at UMC about five hours after the filter was put in.

¶40. Dr. Clay stated it was conceivable that, while the filter was being put in, some clots broke off and went into the heart. He said that it was also conceivable that she was just clotting, and responding so poorly to the blood thinner therapy that she threw them above the filter. But the filter did not prevent Tamara from having further pulmonary emboli.

## ANALYSIS OF ISSUES PRESENTED

### I. Did the Trial Court Err in Granting Jury Instruction Number C-20?

¶41. Bickham first complains that the trial court erred in granting jury instruction C-20, which states:

> You are instructed that you have heard from the expert witnesses who have testified in the case differing views as to what would be the proper procedures to be followed by Drs. Grant and Harris in their treatment of Tamara Bickham. If you find from these opinions that two or more alternative courses of action would be recognized by the profession as being proper and within the standard of care and that Drs. Grant and Harris, in the exercise of their best judgment, elected one of the proper alternatives you should find for Drs. Grant and Harris.

¶42. Bickham contends the instruction amounts to an impermissible comment on the evidence. We find that the instruction is not an outright comment on the evidence because it insulates the would-be comment with the employment of the phrase, "if you find." The instruction, however -- by empowering and inviting the jury to extract two or more professionally-recognizable alternative courses of action from diametrical opinions which purport to define the requisite standard of care -- implicitly instructs the jury that the standard of care lies embedded in each of the opinions. This, of course, could lead the jury to find that Drs. Grant's and Harris's performance met the standard of care when in fact it may have fallen short. It necessarily follows then that this authority granted by the instruction further obfuscates the issue because, as discussed below, it authorized the jury to perform a feat that was neither authorized by law nor warranted by the evidence.

¶43. The first sentence in instruction C-20 tells the jury that the experts have given differing views as to what would be the proper procedures to be followed in the treatment of Tamara. The second sentence allows the jury to find from the differing views two or more courses of action within the standard of care and then allows the jury to find for the doctors if the doctors exercised their best judgment in choosing one of the courses of action within the standard of care.

¶44. Bickham's and the physicians' experts actually gave diametrical views as to what would be the course of treatment constituting the standard of care. Thus, the instruction told the jury that it could find, from diametrical opinions, two or more proper courses of treatment, either of which would constitute the standard of care. The instruction then allowed the jury to exonerate the doctors if the doctors exercised their best judgment in choosing one of the "two or more courses of action."

¶45. It was the jury's duty to determine which one of the opposing positions set forth the standard of care, and the jury was required to make that determination without regard to the "best judgment" of the physicians. In short, the instruction did not require or allow the jury to make any determination as to the standard of care and, instead, allowed them to conclude or find that both diametrical positions as testified to by plaintiff's experts and the physicians' experts, met the standard of care. Under such a scenario, the

doctors would never be found liable because they would always be exonerated for having exercised their best judgment, even if that judgment call resulted in utilizing a course of treatment beneath the standard of care.

¶46. We recognize that there are cases where the standard of care may embrace two or more protocols for treating certain medical conditions, but this case is not one of them. It was not tried as such, and the evidence does not support such a theory. Moreover, the parties were asked to submit supplemental briefs on this issue, and they both agreed that such a theory is inapplicable to this case.

¶47. The jury should not have been instructed to find an impossibility: *two or more proper, alternative courses of action* nestled within exact opposite opinions, each of which purported to define the standard of care. As between opposites, there can be but *one* proper course of action (treatment) that meets the standard of care.

¶48. In reviewing jury instructions, we also must consider whether the instruction is warranted by the evidence. *Hill v. Dunaway*, 487 So. 2d 807, 808 (Miss. 1986). Bickham argues that there is no evidence to support the language that the experts had presented "two or more alternative courses of action" in which to treat Tamara. We agree.

¶49. The use of the phrase "alternative courses" was misleading and created jury confusion. As reflected in the facts above, all of the experts agreed that the proper treatment for thrombophlebitis was the administration of heparin, provided heparin alone got the job done. However, there was sharp disagreement as to whether Tamara's symptoms presented recognizable indications that the heparin was not effective. There was further disagreement as to whether coumadin, another blood thinner, should have been administered along with the heparin. There was even further disagreement as to whether Tamara's symptoms indicated the need for the installation of a filter in her vena cava, as well as the need for a lung scan at an earlier time.

¶50. The physicians argue that instruction C-20 is aimed at evidence regarding the administration of heparin. Two points should be made in this regard. First, the two groups of experts did not describe alternative courses of acceptable treatment. As stated already, each group gave diametrical opinions as to what should have been done, even during the administration of the heparin. Second, the physicians' liability *vel non* turns not on whether they properly provided one aspect of treatment for Tamara but on whether their overall actions fell within the standard of care. The record reflects that after there were indications that the heparin therapy was failing, no other steps were taken. The record also reflects that the physicians either ignored or failed to recognize signs and symptoms of pulmonary embolus; failed to conduct diagnostic testing, such as a lung scan, which would have revealed the existence of a pulmonary embolus if indeed one existed before November 3; and also failed to consider Tamara's blood disorder which prevented the therapeutic effects of the heparin. Knowledge of the disorder certainly would have mandated a different course of action on the physicians' part. Failure in doing these things is not an acceptable "alternative course of treatment."

¶51. As additional support, we find the case of *Day v. Morrison*, 657 So. 2d 808 (Miss. 1995), helpful to our analysis though by no means controlling because the issues are different. In *Morrison*, the trial court gave the following instructions in a medical malpractice case:

The Court instructs the jury that when a physician undertakes to treat a patient, he takes on an obligation enforceable at law to use minimally sound medical judgment and render minimally competent care in the course of services he provides. A physician does not, however, guarantee recovery or favorable results. Therefore, *a competent physician is not liable per se for a mere error of judgment* or the occurrence of an undesirable results, if Dr. Morrison [sic] treatment is accordance [sic] to minimum [sic] standards of a urologist [sic]. In other words, you are instructed that the fact that Mr. Day could not obtain an erection and have sexual relations with Mrs. Day following his penile implant surgery does not raise any presumption whatsoever that Dr. Morrison was guilty of medical negligence.

### D-18

The Court instructs the jury that medicine is not an exact science and liability may never be imposed upon a physician for the mere exercise of a bona fide medical judgment which turns out, with the benefit of hindsight, to have been mistaken and to the contrary to what a qualified medical expert witness in the exercise of his good medical judgment would have done; a physician does not guarantee recovery and *a competent physician is not liable per se for a mere error of judgment* or the occurrence of an undesirable result. You are further instructed that no physician is either a guarantor nor does he insure the success of any medical care or treatment rendered to a patient. Instead, a physician has a duty to exercise such reasonable, diligent, skillful, competent and prudent care as is practiced by minimally competent physicians in the same specialty or general field of practice. Thus, even if you should find from a preponderance of the evidence that the Defendant, Dr. Morrison, was somehow mistaken in his treatment of Mr. Day or that the penile implant surgery may have been performed contrary to what Dr. Furlow would have done, you must return a verdict in favor of Dr. Morrison unless you are convinced from a preponderance of the credible evidence that in caring for and treating Mr. Day, Dr. Morrison failed to exercise that degree of reasonable diligence, skill, competence and prudence which is practiced by a minimally competent urologist under same or similar circumstances.

*Id.* at 811.

¶52. The *Morrison* court concluded that the two instructions were improper because the "two instructions, when read together, tell the jury that even though a doctor may be negligent, that he may not have treated a patient according to the minimally accepted standards, or that he was mistaken, then this is acceptable, and the jury is to find for the Defendant doctor." *Morrison,* 657 So. 2d. at 812. Although the court said the instructions told the jury that it was acceptable that a doctor may not have treated a patient according to the minimally accepted standards, it appears to us that the instructions required the jury to find that the minimally accepted standard of care was met but simultaneously allowed the jury to find for the doctor if he utilized his best judgment in administering treatment within the standard even though it turned out in hindsight that his judgment decision was error. This point is addressed by the dissent in *Morrison*. However, it is not the dissent that we follow; we are duty bound by the analysis given the instructions by the majority opinion.

¶53. The instruction in the case *sub judice* does not contain the phrase "mere error in judgment;" it utilizes the phrase "the exercise of best judgment." The *Morrison* court clearly holds that "honest error in judgment" instructions should not be given in medical negligence cases. If it is improper to give an "honest error in judgment" instruction in instructing a jury regarding a physician's obligation in the performance of treatment

within the standard of care, we can discern no logical reason why it likewise would not be improper to give a "best judgment instruction" in instructing the jury regarding a physician's selection of an allegedly alternative course of action within the standard of care, for in both cases the physician is to be exonerated only if he followed the standard of care, his good judgment or bad judgment notwithstanding.

¶54. This is especially true here where Bickham's experts and the physicians' experts testified not as to acceptable alternative courses of action, but as to two courses of action that are the antithesis of each other. We therefore hold that the trial court should not have given instruction C-20, and the giving of said instruction constitutes reversible error unless the harm caused by said instruction was cured by other instructions.

¶55. We now look to see if the harm done by instruction C-20 was cured by other instructions. It is well established under Mississippi law that we do not review jury instructions in isolation; rather, the instructions are read as a whole to determine if the jury was properly instructed. *Morrison*, 657 So. 2d at 814. Where it may be fairly charged that one or more instructions may have been confusingly worded, we should not reverse if other instructions clear up the confusing points. *Id*. On the other hand, where we find two or more instructions in hopeless and substantive conflict with each other, we often reverse. *Id*.

¶56. The physicians contend that the jury was properly instructed, instruction C-20 notwithstanding, and call our attention to the following instructions which were also given by the trial judge:

### INSTRUCTION C-16

The charge made against Drs. Fred Grant and Steve Harris, and Rush Medical Group, P.A. in this case is one of negligence or medical malpractice. Negligence or malpractice on the part of a physician practicing in the field of obstetrics such as Drs. Grant and Harris would be their failure, if any, to possess and exercise that degree of care, diligence, and skill as is ordinarily possessed and exercised by minimally competent and reasonably diligent, skillful, careful and prudent obstetricians practicing throughout the United States, who have available to them the same general facilities, services, equipment and options as were available to Drs. Grant and Harris at Rush Foundation in October and November, 1991.

Physicians charged with negligence in the care and treatment of their patient may not be judged by hindsight. Drs. Grant and Harris may be held liable for care and treatment rendered Ms. Bickham only if the judgment that they exercised under the existing circumstances fell below the minimally accepted level of care for an obstetrician.

Unless you believe from a preponderance or greater weight of the evidence that the plaintiffs have proven that Drs. Grant and Harris, in their care and treatment of Ms. Bickham failed to exercise such standard of reasonable and ordinary care, skill and diligence as a minimally competent obstetrician would ordinarily exercise in such cases and that such failure, if any, proximately caused Ms. Bickham's death, then your verdict must be for the defendants, Drs. Grant and Harris, and Rush Medical Group, P.A.

### INSTRUCTION C-5

The Court instructs the jury that before you may return a verdict for the Plaintiffs against the Defendant Dr. Fred Y. Grant and Rush Medical Group, P. A., the burden of proof is upon the

Plaintiffs to prove, by a preponderance of the credible evidence, that:

1. the defendant, Fred Grant was the attending physician for Tamara Bickham from October 22, 1991 through November 3, 1991 at Rush Foundation Hospital in Meridian; and

2. In treating Mrs. Bickham, Dr. Grant failed to exercise that degree of care and skill which is required by a minimally competent and qualified Ob-Gyn practicing in the same general field of practice under like or similar circumstances; and

3. His failure, if any, to exercise such care and skill as specified above was also the sole proximate or a proximate contributing cause of the death of Tamara Bickham.

If you believe from a preponderance of the credible evidence in this case that the Plaintiffs have proven all of the above, then you must return a verdict for the Plaintiffs and against Dr. Fred Grant and Rush Medical Group, P. A.

If you find that the Plaintiffs have failed to prove any one or more of these three elements by a preponderance of the credible evidence, then your verdict shall be for the Defendant, Dr. Fred Grant and Rush Medical Group, P.A.

## INSTRUCTION C-11

If you find from a preponderance of the evidence in this case that:

1. Given the circumstances of Tamara Bickham's condition at the time that she was admitted to the care of Dr. Fred Y. Grant on October 22, 1991; and continuing through November 3, 1991; and

2. that a minimally competent doctor in the same field of practice who had available the same general facilities, services, equipment, and options as available to Dr. Fred Y. Grant and Dr. John Harris would have:

A. recognized signs and symptoms of Thrombophlebitis (i.e. clots in the legs) and Pulmonary Embolism (clots in the lungs); or

B. Properly diagnosed and treated her Thrombophlebitis (i.e. clots in the legs) and Pulmonary Embolism (clots in the lungs) or

C. Properly followed the progression of either the thrombophlebitis disease process or the pulmonary embolism process of Tamara Bickham; or

D. Ordered the proper diagnostic studies to treat Tamara Bickham's thrombophlebitis (i.e. clots in the legs) and/or pulmonary embolism (i.e. clots in the lungs); or

E. Timely consulted other specialized physicians to assist with the care and treatment of Tamara Bickham; and

3. that Dr. Fred Grant and/or Dr. John Harris failed to comply with that standard of care in his/their treatment of Tamara Bickham; and

4. such failure or failures, if any, on the part of Dr. Grant and/or Dr. Harris constituted a proximate

cause or contributing proximate cause of Tamara Bickham's death; then, you must return a verdict for the plaintiffs and against one or both of the Defendants, Dr. Fred Grant and Dr. John Harris.

¶57. We agree that the cited instructions appear to accurately state the law in medical negligence cases. However, we are unpersuaded that they cure or correct the problem caused or created by instruction C-20. As stated earlier, instruction C-20 allows the jury to find the standard of care, discussed in instructions C-16, C-5 and C-11, by accepting as true either the standard of care as outlined by Bickham's experts or the physicians' experts. Either one, the other, or neither group of experts was correct, but certainly not both because their opinions were diametrical.

¶58. Our decision regarding Bickham's first issue renders Bickham's second issue, the weight of the evidence claim, moot. Accordingly, we will not consider it. We do , however, find it necessary to address Bickham's third issue.

### II. Did the Trial Judge Commit Reversible Error in Refusing to Grant a Jury Instruction That Would Allow RFH to Be Held Vicariously Liable for the Alleged Negligence of Doctors Grant and Harris?

¶59. Bickham argues that the principal/agency relationship was sufficiently established to be submitted to the jury as an issue. He argues that the jury could have found liability under the doctrines of *respondent superior* or apparent authority. We disagree. Rush Foundation Hospital owes no liability to Bickham.

¶60. Bickham argues that the principles announced in *Hardy v. Brantley*, 471 So. 2d 358, 371 (Miss. 1985), should apply in the case *sub judice*. In considering the hospital's liability for negligent acts of staff physicians under the doctrine of *respondeat superior*, the Mississippi Supreme Court has established that (1) where a hospital holds itself out to the public as providing a given service, ( 2) where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, ( 3) where the patient engages the services of the hospital without regard to the identity of a particular physician and (4) where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of *respondeat superior* applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians. *Hardy*, 471 So. 2d at 371. The supreme court however clarified that "[by] way of contrast and distinction, where a patient engages the services of a particular physician who then admits the patient to a hospital where the physician is on staff, the hospital is not vicariously liable for the neglect or defaults of the physician." *Id*.

¶61. In *Hardy*, Brad Ewing went to the emergency room of Hinds General for treatment of severe abdominal pain. His brother testified that Brad did not enter seeking services of any particular physician. Brad was treated and dismissed. On the next day, Brad experienced more pain; therefore, his brother took him back to the hospital. Shortly after, Brad died. The physician that treated Brad served as an emergency physician at Hinds in accordance with an elaborate contract between Hinds General and the physicians group with which the physician was associated. *Id*. The Mississippi Supreme Court stated that Hinds held itself out as providing full emergency care and treatment and placed physicians in a position where they serve members of the general public, persons who undoubtedly have no knowledge of the hospital's lack of authority to control. *Id*.

¶62. Bickham is correct that *Hardy* and the case *sub judice* are similar; however, they are not identical in that our case fails to satisfy the second prong set forth in *Hardy,* a contractual arrangement. There is no

evidence in the record of the existence of a contract between RFH and the Rush Medical Group. Dr. Grant and Dr. Harris were members of the medical staff who agreed to abide by RFH's rules and regulations in return for the privilege of practicing at RFH. They were subject to the rule that required each area of specialization to provide one on-call staff member at all times. The only authority that RFH asserted over the members of the medical staff was through the credentialing process. The doctors set their own schedule; therefore, RFH did not select Dr. Grant to treat Ms. Bickham. The Mississippi Supreme Court has ruled that the granting of clinical privileges does not establish an employment contract nor an agency relationship. *Trapp v. Cayson*, 471 So. 2d 375, 384 (Miss.1985); *Miss. Ethics Comm'n v. Aseme*, 583 So. 2d 955, 958-60 (Miss.1991). Staff privileges merely permit the physician to use hospital facilities to practice his profession and serve to delimit the physician's authority to practice in the hospital based upon competence in his particular field(s) of practice. *Aseme,* 583 So. 2d at 958. We therefore resolve this assignment of error against Bickham.

## CONCLUSION

¶63. The case is remanded to the Circuit Court of Lauderdale County for trial consistent with the holding of this opinion. However, retrial shall be limited to Bickham's claim against Doctors Grant and Harris.

¶64. **THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED IN PART. THE JUDGMENT IN FAVOR OF DOCTORS FRED Y. GRANT AND JOHN S. HARRIS AND RUSH MEDICAL GROUP, P.A. IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THE TERMS OF THIS OPINION. THE JUDGMENT IN FAVOR OF RUSH FOUNDATION HOSPITAL IS AFFIRMED. THE COSTS OF THIS APPEAL ARE ASSESSED TO DR. FRED Y. GRANT, DR. JOHN S. HARRIS, AND RUSH MEDICAL GROUP, P.A.**

> **KING, P.J., PAYNE, THOMAS, LEE, MYERS AND JJ., CONCUR. SOUTHWICK, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, C.J., AND BRIDGES, J. CHANDLER, J., NOT PARTICIPATING.**

> SOUTHWICK, P.J., DISSENTING:

¶65. The estate and heirs of a decedent brought suit against a hospital, two doctors, and various other defendants for medical malpractice. After trial, a Lauderdale County Circuit Court jury found for the defendants. On appeal three arguments are made: that the verdict was against the overwhelming weight of the evidence, that an erroneous jury instruction on standard of care was given, and that an instruction was needed on vicarious liability. The majority finds error only on the instruction issue. I find the majority two-thirds right and one-third wrong. I address only the point of our disagreement.

¶66. The Bickhams' first assignment of error focuses on jury instruction C-20, which states:

> You are instructed that you have heard from the expert witnesses who have testified in the case differing views as to what would be the proper procedures to be followed by Doctors Grant and Harris in their treatment of Tamara Bickham. If you find from these opinions that two or more alternative courses of action would be recognized by the profession as being proper and within the standard of care and that Doctors Grant and Harris, in the exercise of their best judgment, elected one of the proper alternatives you should find for Doctors Grant and Harris.

¶67. The Bickhams contend that the instruction is an impermissible comment upon the evidence because it implies that the doctors could not be held liable if they exercised their "best judgment" in the course of treating Tamara Bickham. Their principal authority is relatively recent precedent that condemned an instruction that a physician is not liable for an error in judgment. *See Day v. Morrison*, 657 So. 2d 808, 815 (Miss. 1995). The supreme court held that it was improper to instruct a jury that "a competent physician is not liable per se for a mere error in judgment" or to refer to "good faith error in judgment or honest error in judgment." *Id.* at 813-15.

¶68. A review of *Day* reveals that it focused on the confusion that arises from informing jurors that even if the doctor committed "error" there may not be liability. To suggest that only bad faith negligence as opposed to good faith error would justify an award of damages was not a correct statement of the law. *Id.* at 813-14. The court cited dictionary definitions of "error" to support that doctor's errors do in fact create liability. *Id.* at 814. However, the failure of treatment does not equate to error. A doctor is not a guarantor of success. The supreme court held that "bad results notwithstanding, if the doctor did not breach the standard of care, he or she by definition has committed no error in judgment." *Id.* at 815 (quoting *Rogers v. Meridian Park Hosp.*, 772 P.2d 929, 933 (Or. 1989)). The negligent failure to conform to a standard of care is not proven by a lack of success in treatment. Exempting "errors in judgment" misleads the jury in its duty to distinguish between merely having failed results and also having negligent causes.

¶69. Though the Bickhams argue that instruction C-20 violated the *Day* precepts, there is no reference to "error" anywhere in the instruction. So that *Day* defect is absent.

¶70. The word "judgment" is also present in the instruction and is discussed in *Day*. Again quoting the Oregon *Rogers* decision, the *Day* court pointed out that failure to exercise "reasonable judgment" would not necessarily create liability; "reasonable judgment is irrelevant if the treatment option selected provides reasonable care." *Day*, 657 So. 2d at 814 (quoting *Rogers*, 772 P.2d at 933). So the issue that we face is whether reference to "judgment," though potentially irrelevant, is also reversible error. *Day* states that bad judgment in failing even to consider other treatment options does not create liability if the option chosen provided reasonable care. Conversely, good judgment under instruction C-20 in the present case does not insulate a doctor from liability unless it was good judgment in the selecting of a course of action that is within the standard of care.

¶71. Since the use of the word "judgment" in this instruction was coupled with choosing between different treatment choices that all were within the standard of care, I find no potential that the word interfered with a proper finding of liability.

¶72. The next significant part of the instruction concerns "two or more alternative courses of action." The principal argument of error here is that two alternative treatment courses, bot h being within the standard of care, were not shown by the evidence. Instead, the plaintiff argues that there were two diametrically opposed views that simply could not both be considered within the standard of care. Indeed, in plaintiff's brief is an accusation that the defendants' experts were committing perjury in expressing the opinions that they did.

¶73. First I note what the instruction did not state. It did not inform the jury that the divergent opinions expressed were in fact all within the standard of care. That decision was for the jury. Instead, the instruction indicated that more than one way to treat an ailment might be recognized by reasonable medical professionals and that the standard of care could embrace both.

¶74. Next, it is important that the instruction did not state that the jury's task was to place all of the disagreements between expert witnesses into the "two or more courses of treatment" category or to place none of them. The instruction would have allowed jurors to conclude that some of the disagreements reflected alternative treatments in which both were within the standard of care, and other divergences between expert opinions could not be reconciled. An instruction not challenged on appeal (P-28) states that jurors must decide if expert opinions "are not sound, or that the opinion is outweighed by other evidence," and in those events they "may disregard the opinion entirely."

¶75. I examine three significant disagreements as representative examples of what jurors might have applied to either one of these instructions. One is whether at some stage the doctors should have tested for a blood disorder; another is whether a PTT score of one and a half times the baseline or two and a half times was the proper ratio; and finally, whether a separate drug should have been administered sooner.

¶76. The problem with the patient's PTT measurements may have been because she suffered from a blood disorder called antithrombin-III (AT-III) deficiency. There was testimony from the defendants' experts that in 1991 when this treatment was occurring, testing for AT-III was not within the standard of care when administering Heparin. The plaintiff's doctors indicated that testing for the disorder should have occurred once evidence was gained that Heparin was not succeeding. A specific instruction informed the jury that they were to decide whether failure to discover this disorder was within the standard of care.

¶77. There was expert testimony that in 1991 the proper method for administering Heparin therapy was to maintain a PTT score of one and a half to two times the control value. That ratio was maintained here. There was also testimony that beginning in 1991 a significant clinical trial was undertaken at forty medical universities to determine what the proper ratio should be. A control group that was maintained on that baseline was part of the experiment, while other groups received higher dosages. These were two different treatment programs, two regimens, that the jury properly could find were both within the standard of care. Doubts may have existed that led to the clinical trials, but that does not mean that only one approach was within the standard of care.

¶78. Finally, as to the administering of Coumadin, a drug that is part of the treatment program when Heparin proves ineffective, there was testimony that this drug would not have compensated for the AT-III deficiency. There was contrary testimony that it would have been better than Heparin and should have been administered sooner. Rather than an alternative course of treatment, some of the Coumadin dispute is more in the nature of normal conflict in expert testimony. As already indicated, the jurors were instructed on their role in resolving those disputes as well.

¶79. With that evidentiary background, I analyze the validity of the instruction's reference to two courses of action. Mississippi adheres to a national standard of care in medical malpractice cases. *Hall v. Hilbun,* 466 So. 2d 856 (Miss. 1985). As *Day* recognized, there may be more than one treatment option for a medical problem. If the physician chooses one of the reasonable treatment options within the standard of care, that choice does not create liability. *Day*, 657 So. 2d at 814-15.

¶80. A statement of the law consistent with these principles is this:

> Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of

recognized and respected professionals in his given area of expertise.

*Jones v. Chidester*, 610 A.2d 964, 969 (Pa. 1992). This statement can be further clarified by distinguishing among judgment, best judgment and professional judgment. Professional judgment would be the preferred term because it denotes that an objective standard should be applied. *See Klisch v. Meritcare Med. Group, Inc.*, 134 F.3d 1356, 1361 (8th Cir. 1998).

¶81. There was testimony from defense experts which contradicted testimony from plaintiff experts. Whether competent medical authority was indeed divided on the proper course of treatment was as much a question of fact for the jury as was the determination of whether the course of treatment followed was within the standard of care. Here, the jury verdict necessarily meant that the course of treatment taken by the defendants was within the standard of care. Whether the jury also would have found that the opinions expressed by the plaintiff's experts were consistent with the standard of care is unknown and irrelevant for our purposes. What I do conclude is that the instruction that led to this jury verdict was a proper one.

¶82. In addition, instruction C-20 is not to be considered in a vacuum. The instructions as a whole are examined to determine if the jury was properly instructed. *Payne v. Rain Forest Nurseries, Inc.*, 540 So. 2d 35, 40-41 (Miss. 1989). Instructions C-5, C-11 and C-16 provided additional and consistent guidance, and none of them are criticized on appeal. Instruction C-16 informed the jury that the doctors must possess the "degree of care, diligence and skill as is ordinarily possessed by minimally competent and reasonably diligent, skillful, careful and prudent obstetrician practicing throughout the United States." In addition the instruction informed the jury that the doctors actions must be examined under the circumstances as they existed during their treatment of Tamara Bickham, not using hindsight.

¶83. Instruction C-5 instructed the jury as to the steps that it must take to find for the Bickhams. In essence the jury had to find that Dr. Grant failed to exercise the requisite degree of care and skill required by a minimally competent and qualified obstetrician-gynecologist, and that his failure to exercise such skill and care was the cause of Tamara Bickham's death. This instruction makes it clear that the jury must judge Dr. Grant's *professional* actions and decisions.

¶84. Finally, Instruction C-11 instructed the jury that it had to find that Drs. Grant and Harris did not meet the minimal requirements of competence when they failed to properly diagnose, properly treat, properly monitor the treatment, order the proper diagnostic tests and timely consult specialists about thrombophlebitis and pulmonary embolism.

¶85. Accordingly, I find that the trial court did not err in giving Instruction C-20 here. The conflicting expert testimony could be found by the jury to represent two courses of treatment available to Drs. Grant and Harris, from which a choice needed to be made. They may have been different courses, and neither set of doctors may accept that the other course is a valid one. As *Day* discusses, the physicians do not even need to be aware of all possible treatments if they choose one that is within the standard of care. *Day*, 657 So. 2d at 814-15.

¶86. I would affirm.

**McMILLIN, C.J., AND BRIDGES, J., JOIN THIS SEPARATE OPINION.**